## H. A. & L. D. HOLLAND CO. v. NORTHERN PAC. RY. CO.

(Circuit Court of Appeals, Ninth Circuit. May 18, 1914.)

### No. 2332.

1. PUBLIC LANDS (§ 92*)—RAILROAD RIGHT OF WAY—TITLE AND RIGHTS UNDER CONGRESSIONAL GRANT.

Under a congressional grant of right of way for a railroad through the public lands, the land is acquired upon the implied condition that it be used for railroad purposes, and the rights of the company are limited to such use. It has no power to defeat the purpose of the grant by a voluntary alienation of the title, or by abandoning possession to an adverse claimant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 276–282; Dec. Dig. § 92.*]

2. PUBLIC LANDS (§ 92*)—GRANT OF RIGHT OF WAY—TITLE OF RAILROAD COMPANY.

Under the Northern Pacific Land Grant Act July 2, 1864, c. 217, § 2, 13 Stat. 365, which granted to the company right of way through the public lands to the extent of 200 feet in width on each side of the railroad, title to such right of way passed to the company on the filing of the map of the definite location of its road, subject to reversion for nonuse if the road was not constructed on such line, and where the line was located and built through an odd-numbered section of public lands, which subsequently passed to the company under section 3 of the grant, the company took title to the extent of the right of way under section 2, and not under section 3.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 276–282; Dec. Dig. § 92.*]

3. PUBLIC LANDS (§ 92*)—RAILROAD RIGHT OF WAY—DEDICATION AS STREET.

The Northern Pacific Railroad Company laid out and platted an addition to the city of Spokane on an odd-numbered section of what was, when the road was built, public land, to which the company acquired title under the congressional grant. It designated on the plat a street named Railroad street extending along and on either side of its main track. *Held* that, having acquired title to all of the land embraced in the street as right of way under the grant, it could not by any act of dedication vest either the public or private persons with any interest therein which would prevent its use for any legitimate purpose connected with its railroad, and that it could not be enjoined from constructing an embankment through the street for the purpose of elevating its tracks in compliance with a city ordinance.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 276–282; Dec. Dig. § 92.*]

Appeals from the District Court of the United States for the Eastern District of Washington; Frank H. Rudkin, Judge.

Suits in equity by the H. A. & L. D. Holland Company, by George Turner and wife, by H. J. Shinn and wife, and by W. H. Kiernan and wife against the Northern Pacific Railway Company. Decrees for defendant, and complainants appeal. Affirmed.

For opinion below, see 208 Fed. 598.

Turner & Geraghty and Post, Avery & Higgins, all of Spokane, Wash., for appellants.

C. W. Bunn, of St. Paul, Minn., and E. J. Cannon and Graves, Kizer & Graves, all of Spokane, Wash., for appellee.

Before GILBERT and ROSS, Circuit Judges, and DIETRICH, District Judge.

DIETRICH, District Judge. The appellants are severally the owners of property in the city of Spokane, abutting on what is referred to in the record as "Railroad street," which is a strip of land 225.7 feet wide, occupied in part by the railroad tracks of the defendant company, and intersected by cross-streets. Upon February 6, 1912, by ordinance, the city required the defendant to separate its grade from the street grades, and this it proposes to do by means of a dirt fill, approximately 15 feet high and 85 feet wide, with retaining walls of stone or concrete. To prevent the creation of such an obstruction in front of their property in what they contend is a public street,

appellants have brought these suits. "Railroad street" is embraced in the north half of section 19, township 25 north, range 43 east, B M., and lies 100 feet upon the southerly side and 125.7 feet upon the northerly side of the center line of the defendant's main track. Title to the whole of section 19 was acquired under the provisions of the Northern Pacific Land Grant Act of July 2, 1864 (13 Stat. 365). By the first section of that act the Northern Pacific Railroad Company was created, with power to construct and operate a continuous line of railroad from Lake Superior to Puget Sound. The material parts of sections 2 and 3 are as follows:

"Sec. 2. And be it further enacted, that the right of way through the public lands be, and the same is hereby, granted to said 'Northern Pacific Railroad Company,' its successors and assigns, for the construction of a railroad and telegraph as proposed; and the right, power, and authority is hereby given to said corporation to take from the public lands, adjacent to the line of said road, material of earth, stone, timber, and so forth, for the construction thereof. Said way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass through the public domain, including all necessary ground for station buildings, workshops, depots, machine shops, switches, side tracks, turntables, and water stations; and the right of way shall be exempt from taxation within the territories of the United States. * * *

"Sec. 3. * * * That there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific Coast, and to secure safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office."

The railroad company duly signified its acceptance, and upon October 4, 1880, definitely located its line of road through this section 19, which was then unreserved public land subject to the grant, by filing a plat thereof in due form in the office of the Commissioner of the General Land Office, as required by law, and constructed its road upon the line so fixed. On January 20, 1881, it platted a part of the section as "Railroad addition to Spokane Falls," and filed a map thereof in the auditor's office of Spokane county. Upon this map most of the streets, both those parallel with and those crossing the railroad track, are shown to be 75 feet wide, but Railroad street, as already stated, 225.7 feet, with the exception of the easterly end, where it gradually widens out into an unplatted area. A single railroad track is delineated as extending along Railroad street and near the center thereof; also, two short side tracks and a depot or station building. The material part of the written dedication indorsed upon the plat is as follows:

"The width of streets and alleys and size of lots and blocks are as designated in the plat and explanation. The streets shown upon said plat are ded-

icated to be used by the public until lawfully vacated except the strip of land 225.7 feet in width designated as Railroad street which is reserved for the tracks and use of said railroad company."

Thereafter, lots were sold by reference to this plat, among which were those now owned by the plaintiffs, and by the purchasers buildings were constructed thereon. In 1896, through a judicial sale, the defendant succeeded to all the property and franchises of the railroad company.

It is urged by the plaintiffs that the townsite plat, with its indorsements, constitutes a statutory dedication, but if insufficient for that purpose the actual use of the strip by the public, and the conduct and representations of the railroad company's agents and officers were such as to create a common-law dedication and an estoppel in pais. Upon the other hand, the defendant resists these contentions, and further asserts that the railroad company was incapable of divesting itself of title to the land, and that neither private persons nor the public could acquire any rights therein without the consent of Congress. It is conceded that the city could not legally authorize such exclusive occupancy of a street as would be required for the construction and maintenance of the proposed grade, and the controlling question therefore is whether the strip of land is a public street.

[1] 1. Our first inquiry relates to the nature of the railroad company's estate. If title vested in it by operation of section 3 of the grant, there is no room for controversy touching the extent of its rights, for upon that assumption it became clothed with full power of disposition, such as is ordinarily incident to unrestricted private ownership. But a different case is presented if the strip constitutes a part of the right of way granted by section 2. Lands falling within this provision are acquired upon the implied condition that they be used for railroad purposes, and the rights conferred are limited to such use. Generally speaking, it is not within the power of the grantee to defeat the designated purpose of the grant by a voluntary alienation of title, or by abandoning possession to an adverse claimant.

"Manifestly, the land forming the right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company. On the contrary, the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right of way or any portion thereof. The substantial consideration inducing the grant was the perpetual use of the land for the legitimate purposes of the railroad, just as though the land had been conveyed in terms to have and to hold the same so long as it was used for the railroad right of way. In effect the grant was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." Northern Pacific Railway Co. v. Townsend, 190 U. S. 271, 23 Sup. Ct. 672, 47 L. Ed. 1044.

[2] That Railroad street is part of the right of way so acquired, we entertain no doubt. Physically it is embraced within the boundaries thereof; the grant was in præsenti, and was given precision by the filing of the map of definite location; the construction of the road was not a condition precedent to the transfer of title, but title passed upon the selection of a definite route, attended with notice to

the government of such selection, through the filing of the map of definite location. N. P. R. Co. v. Murray, 87 Fed. 648, 31 C. C. A. 183; Land Co. v. Griffey, 143 U. S. 32, 12 Sup. Ct. 362, 36 L. Ed. 64; Tarpey v. Madsen, 178 U. S. 215, 20 Sup. Ct. 849, 44 L. Ed. 1042; Missouri, etc., R. Co. v. Cook, 163 U. S. 491, 16 Sup. Ct. 1093, 41 L. Ed. 239; Railroad Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122; Van Wyck v. Knevals, 106 U. S. 360, 1 Sup. Ct. 336, 27 L. Ed. 201; Railroad Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578. There is nothing to the contrary in Jamestown, etc., R. Co. v. Jones, 177 U. S. 125, 20 Sup. Ct. 568, 44 L. Ed. 698, or Stuart v. U. P. R. Co., 227 U. S. 342, 33 Sup. Ct. 338, 57 L. Ed. 535, or N. P. R. Co. v. Smith, 171 U. S. 260, 18 Sup. Ct. 794, 43 L. Ed. 157. In the first and second of these cases it was decided only that the definite location of a route may, not must, be made by the actual construction of the road. In the Smith Case it was apparently the opinion of the court that the filing of the map of definite location did not necessarily exhaust the railroad company's power of selection, and that, under the circumstances there shown, it acquired a right of way along the line of the road as actually constructed, even though such line deviated from that exhibited upon the maps. But if we assume that in the absence of intervening private rights the railroad company might, with the approbation of the administrative officers of the government, change its route and make an effective selection of a new right of way by the construction of its road, without amending its map or filing a new one, it does not follow that the filing of the map of definite location is ineffective or fails to consummate the grant. If it be objected that the act provides for only one right of way, and the company cannot hold two, the answer is that a title acquired either by the filing of a map or the construction of the road reverts to the United States in case of abandonment, or of forfeiture through nonuser, and that therefore, where, as in the Smith Case, the right of way shown upon the map of definite location is not occupied by the road as actually constructed, it is to be deemed to have been abandoned and the title thereto lost. In the present case the route was never changed, and it is therefore held that title to the right of way 200 feet on either side of the center line of the railroad track, and including the strip in controversy, passed to the railroad company on October 4, 1880, the date its map was filed in the General Land Office.

We are unable to accept the view that, because the right of way at this place is in an odd-numbered section, the railroad company took the absolute title, unlimited by the implied condition of reverter attending the right of way grant. No substantial reason has been assigned, and clearly there is none, for assuming that Congress intended such an artificial and whimsical distinction. A strip of land 400 feet wide through the public domain was being withdrawn from private entry and dedicated as a right of way for a transcontinental railroad. The value of a right of way is dependent upon its continuity, and surely it could not have been contemplated that in case of reversion the government would get back only numerous disconnected fragments of that which it was granting as a continuous line. There is lit-

tle weight in the suggestion that Congress could not have intended a uniform status for the entire right of way, because it doubtless knew that any route which might be selected would here and there traverse private holdings, and that therefore the continuity of the grant would be broken. True, absolute continuity was not to be expected, but when we consider the vast stretch of public domain over which the road would pass, and the rarity and insignificance of the private holdings, it may readily be concluded that these interruptions were thought to be negligible, as affecting the value of the right of way as a whole.

In support of their position, appellants invoke the general rule that, where two titles relate back to the same point of time, there is a merger, and the greater title prevails from the beginning. It is conceded, however, that this doctrine, if the appellants' application of it be correct, would here come into conflict with the controlling principle that the granting act must be construed in such a manner as to give effect to the legislative intent, provided it be found that Congress intended that the right of way throughout should be held subject to the conditions and limitations declared in the Townsend Case. Such, we have no hesitation in finding, was the intent of Congress, and therefore it is not deemed necessary to consider the correctness of the assumptions upon which appellants' application of the rule necessarily rests, namely, that, as the terms are used in the learning upon the law of merger, the estate of the grant-in-aid is greater than that of the right of way grant, and that they both date from the same point of time.

[3] 2. It thus appearing that the railroad company acquired the strip of land in controversy as a part of its right of way, we next consider to what extent the limitation of the right of way grant controls the present issue. Conceding that under the doctrine of the Townsend Case the grantee's powers are greatly restricted, appellants contend that the incapacity does not necessarily extend to cases of dedication for a public street. Attention is directed to the fact that, while holding that ordinarily an individual is incapable of acquiring for private purposes any portion of the right of way, the court was careful to say that the grant is nevertheless "amenable to the police power of the state," and added by way of illustration that Congress must have assumed "that in the natural order of events, as settlements were made along the line of the railroad, crossings of the right of way would become necessary, and that other limitations in favor of the general public upon an exclusive right of occupancy" might be justly imposed. In Northern Pacific Railway Co. v. City of Spokane, 64 Fed. 506, 12 C. C. A. 246, we sustained the dedication of such crossings. What then is the principle upon which exceptions are to be allowed to the general rule of limitation? It is true, as pointed out by appellants, that the concrete cases sanctioned in these decisions involve concessions to a public use; but it is not thought that the power to limit the railroad company's right to exclusive possession is dependent upon this condition alone. Public uses are of many kinds, and it would not do to say that the defendant may part

with its right of way, or the possession thereof, at its option, provided only that the disposition is for some public purpose. It must be borne in mind that the grant from the government was not for public purposes generally, but for a single designated public purpose, and an unnecessary diversion to a foreign use constitutes a violation of the conditions of the grant, in cases as well where such use is public as where it is private. Public use implies an underlying necessity, and the fundamental consideration, therefore, is that of superior need. But, as already suggested, the grant is not to be regarded as the source from which all public needs may be supplied. A public building is a public use, but surely the site therefor cannot for that reason alone be carved out of the right of way. The needs to which the railroad company's right to exclusive possession must yield are such only as arise out of, or are connected with, the maintenance of the right of way and the operation of a continuous line of railroad thereon. In other words, the railroad company is authorized to make, and may be compelled to make, reasonable provision for those needs only which it is instrumental in creating, or which inhere in the very nature of an unbroken right of way.

If by resort to probabilities we seek the legislative intent, to which, in so far as it may be discerned, all questions must be referred, we reach the same conclusion. Upon the one hand, the implication is clear that Congress intended that the right of way should be held and used exclusively for railroad purposes, and upon the other, it is fair to assume, it was not desired that the use be in disregard of the rights and convenience of those who should take up their abode along its course. It must have been contemplated that highway and other crossings would, in the very nature of things, be required, and in view of the self-evident need therefor, together with what must have been a common and well-understood practice of making provision for them in railroad operation, it is reasonable to suppose that the grant was made with the implied consent that ways of necessity, both public and private, might be laid out across the right of way at such places and under such conditions as would not unreasonably impair its usefulness for the purpose for which it was created.

But in no substantial sense do these considerations apply to the case of a street or other highway laid out along, instead of across, the right of way. Granting the need of a road running parallel or in the same general direction with the railroad, there is no necessity for imposing the burden thereof upon the right of way. It is hardly probable that the practice of so locating a highway was common at the time the act was passed, and, upon the whole, it is unreasonable to suppose that Congress anticipated that such a use would ever be made of the right of way. It imposes a much greater burden than a mere crossing, for it is practically exclusive of both possession and use by the railroad company, while a crossing only qualifies or temporarily interrupts such possession and use. We do not say that a case is inconceivable where, for a limited distance, some concession may not properly be made for this or an analogous purpose; but the necessity must be great and the conditions unusual in the extreme to

warrant it. Here manifestly no such conditions existed. No motive other than that of gain could have actuated the railroad company in attempting to utilize a part of its right of way for a street. It would have been entirely practicable to carve a street out of its aid land upon either side of, and contiguous to, the right of way, and the right of way was resorted to, not in consideration of any public need, but for reasons of private thrift alone. It may be that some discretion is vested in the railroad company to determine the existence of the requisite necessity upon which its right or duty to grant an easement is predicated, which, in doubtful cases, the courts will not review; but the instant case presents no ground for the exercise of such discretion. True, the defendant's predecessor may have entertained the view that the grant was in excess of its needs for railroad purposes, both present and prospective, but that was a question which was never committed to its judgment, and, whatever may have been its views in that respect, they could not serve to confer an authority which otherwise it did not possess.

"By granting a right of way 400 feet in width, Congress must be understood to have conclusively determined that a strip of that width was necessary for public work of such importance." Northern Pacific Railroad Co. v. Smith, 171 U. S. 261, 275, 18 Sup. Ct. 794, 799 (43 L. Ed. 157).

"Neither courts nor juries, therefore, nor the general public, may be permitted to conjecture that a portion of such right of way is no longer needed for the use of the railroad, and title to it has vested in whomsoever chooses to occupy the same." Northern Pacific Ry. Co. v. Townsend, supra.

Congress has not authorized the disposition of unused portions of the right of way. The power of the railroad company to alienate, as well as the power of others to acquire, any part thereof, is measured, not by what can be spared from railroad uses, but by what is required to meet such needs of the public or of individuals as fall within the scope of the principle already discussed. Privileges conferred by revocable licenses are, of course, excluded; in such cases the railroad company never loses its right to possession and control.

It is to be added that there is little analogy between the case here presented and the facts in Chicago, R. I. & P. R. Co. v. Union Pacific Co. (C. C.) 47 Fed. 16; Id., 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265. That case involved a consideration of the power of the Union Pacific Company to make a contract by which it was to let the Rock Island Company into such use of its bridge and tracks as it did not need for its own purposes. As observed by the Supreme Court, it was such a contract as is "frequently made between railroad companies. * * * By the contract the Pacific Company parted with no franchise, and was not excluded from any part of its property or the full enjoyment of it. What it agreed to do was to let the Rock Island into such use of the bridge and tracks as it did not need for its own purposes. This did not alien any property or right necessary to the discharge of its public obligations and duties, but simply widened the extent of the use of its property for the same purposes for which that property was acquired, to its own profit so far as that use was concerned, and in furtherance of the demands of a wise public policy."

To the suggestion that the Pacific Company might, if bound by the contract, become disabled in the future, through an increase of business, from performing the obligations of its franchise, the court responded that such a contingency was extremely remote, and added that, "should it happen, however, the courts are competent to relieve from the consequences of so radical a change of conditions."

Entertaining the foregoing views, we do not deem it necessary to consider the other questions discussed. If, as we hold, that part of the right of way embraced in Railroad street was, under the circumstances of the case, incapable of being diverted from the purpose for which it was granted, for use as a longitudinal street, it is quite unimportant to inquire into the acts and intent of the parties, or to determine what was really attempted to be done. Whatever the findings of fact might be upon those questions, the plaintiffs could not successfully invoke the doctrine of estoppel. Neither the acts nor the acquiescence of the grantee of the government grant can operate to defeat the will of the grantor. Whatever may be the equities in favor of the plaintiffs, we cannot give them place without violating the integrity of the grant. They can hardly be of greater dignity than those of the farmer, who, in good faith, has bought and paid for a portion of the right of way, and reduced it to cultivation; but it is not pretended that such conveyance could be sustained. In either case the hardship, unfortunate though it be, is but the result of a misapprehension of the law. The reasons for upholding a diversion from the purpose of the grant are no greater in one case than in the other. Taking cognizance of the existence of such equities, Congress has provided a measure of relief. By the act of April 28, 1904 (33 Stat. 538), conveyances theretofore made by the railroad company of portions of the right of way were validated; but with the proviso that no such conveyance should have the effect of diminishing the right of way to less than 100 feet upon either side of the center of the main track. Thus Congress has expressly reaffirmed its purpose that the right of way, now to a width of 200 feet, shall be held intact, and this purpose it is the duty of the courts to sustain.

Accordingly, the decree appealed from will be affirmed, with costs to the appellee.