ALBERT NEWTON CAMPBELL, ROBERT WITT
SHINGLE AND JOHN KIRKWOOD CLARKE,
TRUSTEES UNDER THE WILL AND OF THE
ESTATE OF JAMES CAMPBELL, DECEASED, *v.*
ABIGAIL WAHIIKAAHUULA CAMPBELL KA-
WANANAKOA, ET AL.

No. 1957.

SUBMITTED MAY 27, 1930.          DECIDED JUNE 26, 1930.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.

This is a suit in equity instituted by the trustees under the will of James Campbell, deceased, for the purpose of securing a construction of the will in so far as the same may be necessary to determine the two questions set forth in the bill.

The testator in his lifetime executed a lease to one B. F. Dillingham, dated November 19, 1889, for the term of fifty years, from January 1, 1890, to January 1, 1940, of large tracts of land in the district of Ewa on this Island. On December 10, 1889, B. F. Dillingham subleased a part of those lands to W. R. Castle for a term to extend from January 1, 1890, to December 1, 1939. W. R. Castle in turn assigned his sublease to the Ewa Company on February 4, 1890. The Ewa Plantation Company is still the holder of that sublease, with an unexpired term at this date of a little over nine years. On December 12, 1889, Dillingham assigned to the Oahu Railway and Land Company, Limited, his lease from the testator. On February 13, 1897, the O. R. & L. Co. granted to the Oahu Sugar Company a paid-up lease of another part of the lands demised by the testator's lease, this sublease to run for forty-three years, from January 1, 1897, to December 31, 1939. The Oahu Sugar Company is still the holder of this second sublease.

Late in 1923 and in the early part of 1924 negotiations were had between the Ewa Plantation Company and the trustees under the will of the decedent for a renewal of the lease held by that company. The parties were at that time unable to agree upon terms and the negotiations were discontinued. Again in the early part of 1927 negotiations were had, these resulting likewise in failure. In 1928 for a third time negotiations were entered into, resulting in certain tentative agreements in pursuance of which this suit was instituted.

In compliance with these tentative agreements the trustees addressed to the Ewa Plantation Company, the Oahu Sugar Company and the O. R. & L. Co. a letter asking for bids for a new lease upon terms which were to include the following: that the new lease should be subject to all existing leases; that the new lease should be for a

term of fifty years from January 1, 1929; that by the new lease there would be demised to the lessee the lands of the testator, containing an area of more than 8915 acres, which at present are held by the Ewa Plantation Company under the existing leases and the lands of the testator (contiguous to those of the Ewa Company's) occupied by the Oahu Sugar Company under existing leases and containing an area of about 2400 acres,—together with, in each instance, all of the improvements upon the land (these including in the case of the Ewa Company a complete sugar mill); the payment of $200,-000 in cash on the execution of the lease; the payment of $200,000 annually beginning January 1, 1929, and extending to but not including January 1, 1940; the payment thereafter, as rent, of a percentage of the gross proceeds of all sugar and other products of the demised land but not less in any event in any one year than $300,000; the payment by the lessee of all taxes, assessments, rates and governmental charges; the payment by the successful bidder of the legal expenses and costs of court for which the trustees are liable or which they may incur in connection with these proceedings and the execution of the lease, but not exceeding the sum of $25,000; that "a bidder may nominate in the bid a person or persons or corporation or corporations to whom the trustees shall execute and deliver a lease, or leases, of portions of the demised premises," with certain provisions not now material; and some other provisions of perhaps lesser consequence.

In answer to this invitation the Ewa Plantation Company and the Oahu Sugar Company presented a joint bid which, in accordance with the terms of the agreement between the parties, was deposited, unopened, with the clerk of the circuit court of the first judicial circuit to await the final determination of these judicial proceedings. The O. R. & L. Co. did not make any bid. The joint bid of the

two sugar companies named is for all of the lands specified in the "proposal," to-wit, all the lands (with certain immaterial exceptions) now occupied by the Ewa Company under its sublease and all the lands (with certain immaterial exceptions) now occupied by the Oahu Company under its sublease. This joint bid contemplates that there shall be two leases, one from the trustees to the Ewa Company of the lands now occupied by that company and the other from the trustees to the Oahu Company of the lands now occupied by the latter company. The only inference is that the two joint bidders have arrived at an understanding as to how the money payments stipulated for by the trustees in their "proposal" are to be shared by and between them.

The questions asked in the bill are as follows: "(1) Can the trustees under the will and of the estate of James Campbell, deceased, now make a legal and valid lease for the term of fifty (50) years from January 1st, 1929, subject to existing leases and the rights of the lessees or sublessees thereunder, expiring respectively December 31st, 1939, November 30th, 1939, and December 31st, 1939, of the property mentioned in said proposal for a lease, and not subject to termination by reason of the termination of the trust within said fifty (50) year term? (2) Are the payments of two hundred thousand dollars ($200,000.00) cash upon the execution of the proposed lease and/or the annual payments beginning January 1st, 1939, as outlined on page four of said proposal corpus or income? How are these payments to be accounted for by the trustees?"

Whether trustees acting under a will have power to lease lands depends upon the terms of the will. Sometimes that power is expressly granted to them. Sometimes it is to be found by implication from other provisions of the instrument. Ordinarily when the power to lease exists it is a power to lease only during the duration

of the trust, unless the contrary appears from the will, either directly or by implication.

"Express power to lease the trust property is frequently conferred upon trustees by the instrument creating the trust, and, when such is the case, a lease to be valid must conform to the power. \* \* \* Where the legal title to land is vested in trustees, charged with the performance of active duties, with the intention that they shall raise an income therefrom, a power to lease for such terms as are reasonable and necessary to carry out the intent of the grantor will be implied. But no such power can be implied where it would be contrary to the intention of the instrument creating the trust or where the trustees have no active duties to perform. \* \* \* The length of the term for which a trustee is authorized to let is a matter depending for the most part upon the provisions of the instrument and the facts and circumstances surrounding the particular trust. \* \* \* In the absence of express power from the instrument the trustees cannot grant a lease or provide for a renewal to extend beyond the life of the trust estate but such a lease, if made, may be sustained to the extent of the trust estate." 28 A. & E. Ency. L., 1006-1008.

"Trustees possess general power to lease trust property on such terms, conditions and rentals as are reasonable and customary for that class of property in the particular vicinity, provided the interests of remaindermen and those entitled to the property after the termination of the trust are not injured thereby, and provided, ordinarily, that the lease is not made after the termination of the trust or made to continue after the termination of the trust, either directly or by means of renewals." 39 Cyc. 387, 388.

"In cases of this kind the weight of authority is to the effect that the lease is not binding upon the remainder-

men after the termination of the trust unless the trustee has been given express power to make leases which shall bind the remaindermen." 2 Perry on Trusts and Trustees (7 ed.), Sec. 484.

"Ordinarily the trustee has no power to lease the trust property for a term extending beyond the life of the trust." Bogert on Trusts, 314.

The decided cases, which are not very numerous, are not in entire accord. Some courts, notably Illinois and Wisconsin, have gone quite far in authorizing trustees to execute leases for long terms extending beyond the termination of the trust. In some instances such decisions are based upon the view that the purposes of the trust, as shown by other provisions of the will, require the granting of such leases. In other instances the authorization has been granted by courts to trustees upon the theory that an emergency or set of circumstances has arisen which was not foreseen or provided for by the testator and that it becomes necessary for the court to authorize such leases in order to preserve the corpus of the trust or in order to secure the necessary income. Still other cases seem to make it the test whether the lease is called for by good business management and is profitable to the beneficiaries. "The Wisconsin and Illinois courts have gone far in exercising equitable jurisdiction to authorize long term leases, for the reason merely that the lease is beneficial to the trust estate, or a good business venture, though not of underlying necessity for the preservation of the estate. On the other hand, the majority of the cases in which application to courts of equity has been made for authority to execute long term leases have held that the duration of the trust ordinarily limits the term for which such property may be leased by the trustees, and to take the particular case out of that rule, there must be shown to exist an exigency rendering an execution of a long term

lease reasonably necessary for the preservation of the property, or for effectuating the intention of the trustor with regard to the purposes of the trust. There seems to be a trend to determine that the lease is 'reasonably necessary' within the rule, when it is highly beneficial to all the parties and advantageous to the income of the estate." 38 Yale Law Journal, 801-802.

This tendency, if it is such, should not be too readily yielded to. The intent of the testator should be the ultimate guide in this class of questions of construction as well as in other classes. If it is apparent, directly or by implication from the face of the will, that the testator intended that the power of his trustees should extend, in the case of leases, beyond the termination of the trust, that desire should of course be effectuated; but when he has clearly set a limit for the duration of the trust the inference ordinarily is that, in the absence of other language to the contrary, he meant that all of the powers of the trustees should cease at that time and that they should not be permitted by long term leases to restrict the title and the powers of the remaindermen.

It may be assumed for the purposes of this opinion, without so deciding, that it is possible to conceive of cases in which the provisions of a will relating to the duty to secure income are such as to justify the trustees in granting a lease to extend beyond the end of the trust and also that instances of emergencies may arise, unforeseen and unprovided for by the testator, which will justify the court or the trustees, in order to preserve the corpus of the estate, to grant a lease for such a term.

At this point it becomes of importance to examine the provisions of Mr. Campbell's will. After giving to his wife one-third of the value of his personalty and to his wife and their children the right to use and occupy during the life of his wife the residence on Emma street and

the residence at Leahi and after providing for a monthly allowance for the maintenance of his family and for the partition of the two residences amongst his surviving children and the lawful issue of any deceased child, the testator says: "With respect to all property which shall be so distributed to them, other than that mentioned in the last preceding paragraph" (the two residences), "I direct my trustees aforesaid to reduce it to possession and to hold, manage, control, preserve and direct it, and to pay all costs and charges thereof, including their own commissions for such administration. And to collect all the rents, issues, profits, income and revenue thereof,"—with other powers relating to the investment and reinvestment of capital and the keeping of accounts.

The trustees were directed to pay from time to time one-third of the net income to the wife, for the remainder of her natural life. "And the remaining two-thirds of the net income, rents, issues and profits of and from said realty, during the natural life of my said wife, and, after her death, the entire net sum thereof, shall be by my said trustees included in one fund with the net income and revenue of and from all my estate other than such realty, which shall be under their control by virtue of this will, and such fund shall be by them at stated intervals of not more than six months divided into as many equal parts as there shall be then *in esse* any of my children by my said wife, and shall be by said trustees paid to my said children, from and after their respective majority or marriage, share and share alike; provided, that if any of my said children shall decease, leaving lawful issue, such issue shall stand in the place or places of his, her or their parent or parents in all respects concerning the division, payment and receipt of the fund herein mentioned." Additional provision is made for the maintenance, education and travel of the children while minors.

The testator further declared as follows: "It being my purpose herein to provide a safe and certain income and maintenance for my wife, our children and grandchildren, for and during the period of the trusts hereby established, I do will and direct that each female beneficiary hereunder shall receive and hold all moneys and other rights and privileges herein provided for, free from the debts and control of any husband she may have after the date of the execution of this will,—and that the trustees herein named, and their successors in trust hereunder, shall keep intact my estate and administer the same under the name of 'The Estate of James Campbell,'—and that the realty thereof (except as herein provided in the case of said residence premises) shall be particularly and especially preserved intact and shall be aliened only in the event and to the extent that the obvious interests of my estate shall so demand."

The power thus given to the trustees to manage the property, both real and personal, would include *prima facie* the power to lease lands. That that was the intention of the testator in this instance is made doubly clear by his declaration that it was his purpose "to provide a safe and certain income and maintenance for my wife, our children and grandchildren," together with the express and very pressing caution that, with the exception of the two residences, no lands are to be sold unless "the obvious interests" of the estate "shall so *demand.*" His intention clearly was that no lands were to be sold unless the sale should be indispensable to the "obvious interests" of the estate. He expressly says, also, that the trustees are to collect "rents" in addition to other income. The securing of a "safe and certain" income was made one of the foremost duties of the trustees. The lands were not to be sold, rents were to be collected and the trustees were to have the power to manage the estate. These provisions show

clearly that it was the intention of the testator that the trustees should have the power to grant leases of lands.

It seems likewise clear to us that it was his intention that the time of granting any particular lease should be a matter resting largely in the discretion of the trustees. If in any instance the surrounding circumstances are such as to make it necessary in order to assure a sufficient, certain and largely increased income that a new lease shall be granted while yet a term of years, ten for instance, remains unexpired of an older lease, that is within the power of the trustees,—subject always to control by the court in case of an abuse or threatened abuse of discretion. The evidence amply supports the decision of the trustees to grant a new lease now, without waiting for the expiration of the old lease.

On the other hand it is our opinion that no lease can be granted whose term is to extend beyond the termination of the trust. That, as above stated, is the ordinary rule with trustees acting under wills or other instruments. We find nothing in this will requiring or authorizing a departure from the ordinary rule. The power to lease is not given expressly. No reference is made to it. It is to be found merely by implication from the other provisions of the will. In addition to the reason leading to the ordinary rule just stated, limiting the terms of leases granted by trustees to the duration of the trust, that all the powers of trustees are intended to cease with the end of the trust and that the duty to deliver the corpus of the estate to the remaindermen is intended to be a duty to so deliver free from embarrassments created by the trustees, there is in the case at bar the further strong consideration that the testator has expressly said that "the authority of my said trustees hereunder shall continue during the natural life and lives of my said wife, and of my children by my said wife, who shall be *in esse* at the date of my decease, and

the survivor of them; and, if there shall be *in esse,* at the death of such survivor, any lawful issue of any such child as last aforesaid, then these trusts, and the authority of said trustees hereunder, shall further continue for the definite term of twenty years after the decease of such survivor, provided any such lawful issue as aforesaid shall live so long, and if not, then for such lesser term and period as he, she or they shall live." This is an unambiguous statement of the testator's intention and desire that the authority of his trustees shall cease at the time specified by him. Their authority will cease at the death of the survivor of the testator's four children who are now still living if there shall then be *in esse* no lawful issue of any such child; or twenty years after the death of the last survivor of the four children provided lawful issue of any of the four children shall so long live and if not then until the death of the last survivor of the lawful issue of any of the four children. In the light particularly of this provision the trustees could not grant a lease after the termination of the trust. So, also, it would be contrary to the intention of the testator for them to execute prior to the termination of the trust a lease to extend beyond the period of the trust.

Under the circumstances of this case, as disclosed by the evidence, a term of fifty years is not unreasonably long. It is within the power of the trustees to grant, provided only it will not extend beyond the duration of the trust. Any excess beyond the end of the trust period will be void.

The desire of the testator to provide a "safe and certain" income for his descendants does not, upon the evidence, require or justify the inference that he intended the trustees under existing circumstances to have the power to grant a lease or leases extending beyond the termination of the trust. It is true that the evidence shows

that an assured term of fifty years will bring the highest possible rental; but we are not persuaded, if indeed there is any evidence to that effect, that a term of forty, thirty or twenty years will not bring a very gratifying rental even though not quite as large as that stated in the call for bids. Nor are we persuaded by the evidence adduced that a lease for fifty years, provided the trust shall so long continue and, if it does not, then for the full remainder of the period of the trust, will not bring the same amount of rental as that prescribed in the call for bids or an amount which, though not as large, will nevertheless be gratifying and sufficient to provide for a more than comfortable maintenance for the beneficiaries of the trust.

Section 2464, R. L. 1925, as amended by Act 92, L. 1929, provides that "any circuit judge sitting at chambers in equity and having jurisdiction over a trust, on petition of the trustee, or of a majority of the trustees, if more than one," and after notice "may, if it appears to be for the benefit of the trust estate and not contrary to the provisions of the trust, authorize or direct the trustee or trustees  *  *  * to lease or extend the terms of leases of the real property for such periods as may be deemed advantageous to the estate;" and that "any lease or extension of lease made under such authority or direction shall continue in force for the full period so authorized notwithstanding the trust shall have terminated." This statute, while referred to in the briefs by the petitioners and the other parties to this proceeding, does not appear to be relied upon to any great extent. By its own terms it does not apply to the case at bar because, as we hold, it would be "contrary to the provisions of the trust" for the trustees to lease for a period extending beyond the termination of the trust. The testator has expressly declared in his will that he wishes *all* the authority of his trustees, and all their dominion over the property, to cease at the

time· that he has chosen for the termination of the trust.

The remaining question relates to the disposition of the sum of $200,000 which under the terms of the arrangement between the trustees and the bidders is to be paid upon the execution of the lease and the eleven annual payments of $200,000 each which are to be made by the successful bidder or new lessee, beginning January 1, 1929, and ending January 1, 1939, a total of $2,400,000. There can be no doubt that these payments are all income and none of them principal or corpus. No capital of the estate is being sold. No waste of the principal is being contracted for, as would result, perhaps, in the case of an oil lease or a mining lease. Subject only to ordinary and unavoidable use and wear and tear, the principal involved, to-wit, real estate, will all be available and returnable question is whether that income belongs under the trust in as good condition as it is now. The only debatable question is whether that income belongs under the terms of the will, on the one hand, to those who are income-takers at the date when each of these twelve payments accrues, or, on the other hand, to those only who will be income-takers from and after January 1, 1940. The term "remaindermen" was frequently used at the trial and to some extent in the briefs in this court erroneously as referring to those who will be entitled to the income at and after the death of those who are strictly life tenants, to-wit, the four living children of the testator. The term "remaindermen" is here used as referring only to those who will be entitled to the corpus of the estate at the termination of the trust. Some of those same persons last referred to may also be entitled to income prior to the termination of the trust. The grandchildren, being children of any one of the four now surviving children of the testator, upon the death at any time of their mother will become income-takers from that time until the ex-

piration of the trust; and if they survive until the expiration of the trust they will also become remaindermen.

The argument is made by the guardian *ad litem* of the minor respondents, who are grandchildren and great-grandchildren of the testator, that the twelve sums of $200,000 each which are to be paid prior to January 1, 1940, are in reality rent for the use of the demised lands after January 1, 1940, because, as it is urged, the trustees have no title remaining in them to pass to the new lessee for the period preceding January 1, 1940, in view of the fact that the old lease granted by the testator himself is in existence, extends until 1940 and will continue to vest in the present sublessees the right to the use of the lands until that year. At first sight there might seem to be some force in this contention, but on careful consideration it cannot be sustained. In the first place the lease from the testator to Dillingham contained the usual clause of forfeiture by the lessee and reentry by the lessor for breach of the covenant to pay rent and of any of the other terms on the part of the lessee to be performed. The trustees therefore still retain a possibility of a reversionary interest, upon breach of condition. The Ewa Plantation Company and the Oahu Sugar Company may well consider it an element of value to them to acquire for the present unexpired term of the old lease a new lease or leases direct from the trustees which shall not be subject to the possibility of failure of performance (at least of the covenant to pay rent) by the O. R. & L. Co. which now stands in the position of direct lessee of the trustees. The trustees have it in their power to grant to each of these two sublessees and bidders the assurance that no failure of performance by the O. R. & L. Co. shall visit a forfeiture upon the successful bidder or bidders.

In the second place there is the moral consideration that the trustees are not now receiving and that the Ewa

Plantation Company is not now paying as much rent per annum for the use of these large and valuable sugar producing lands as ought in justice and under sound principles of business and economics to be received and paid, in the absence of a prior agreement to the contrary. The undisputed evidence shows that in preparing their proposal or invitation for bids,—a proposal which has been approved and acquiesced in by the submission of a bid by the two sugar companies—the trustees first considered with the aid of men long experienced in the sugar business in these Islands what was the true and just rental value of the lands in question; that they determined that that rental value of the lands, unencumbered by any prior lease, was at least $300,000 per annum; that they therefore named in their proposal as the minimum annual rent for the period succeeding January 1, 1940, a period freed from the embarrassments of any other lease, the sum of $300,000; and that, in view of the fact that the Ewa Plantation Company is now paying about $100,000 rent per year to the O. R. & L. Co. under the old lease, they subtracted this amount from the true annual rental value of $300,000 and incorporated in their proposal a term that for the remaining period of the existence of the old lease the successful bidder should pay to the trustees the balance of $200,000 which the trustees are not receiving but which in equity and good conscience they ought to receive.

In the third place the evidence clearly shows that in view of the fact that the existing leases have less than ten years to run the lessees are required for their own protection to confine themselves to the minimum possible expenditures for replacements, repairs, replanting, fertilizing and other similar purposes and will therefore be unable for the remainder of the term to produce for themselves the maximum of profits that otherwise would be

derivable from the demised lands. By granting the occupants now a new lease the lessors give them the opportunity to secure for themselves these added profits.

In the fourth place the parties concerned in their negotiations have regarded the twelve payments of $200,000 each as being additional rent in equity due and properly payable to the trustees, not for a period succeeding January 1, 1940, but for the period preceding that date.

Under these circumstances it seems to us that it cannot be correctly said that the trustees have nothing of value to give to the successful bidder or bidders for the period preceding January 1, 1940. They have left in them the power to assure the two plantation companies against any default on the part of the O. R. & L. Co. and to enable them to derive larger profits from the land prior to 1940. They have the claim, well founded in good morals although not legally existent or enforceable because of the prior lease, to the balance or excess of the rental value of today, payment of which under the terms of the old lease the present sublessees are escaping.

Those who will be income-takers after January 1, 1940, will be entitled to the rentals accruing from and after that date, not less than $300,000 annually. In our opinion it was the intention of the testator, under the circumstances here under consideration, that these installments of $200,000, which are clearly income, should go to those who are or will be income-takers at the dates when they severally accrue and become payable to the trustees. That maintenance and support which the testator desired to furnish to his children as clearly as he did to his grandchildren and to his great-grandchildren will thus be assured. To withhold for the present these twelve sums as they come in from time to time for distribution to the income-takers of the future (after January 1, 1940) and to restrict the income-takers of the

earlier period to the meager $20,000 which is available under the terms of the old lease would not, we think, be carrying out the wishes of the testator. He drew no distinction between old leases and new leases. He intended that the rents of his lands should be divided as they accrued amongst those who would then be income-takers.

A decree in conformity with these views will be signed upon presentation.

*A. Lewis, Jr.,* for petitioners.

*Thompson, Beebe & Winn* for Abigail Kawananakoa, Muriel Shingle and Beatrice Beckley.

*E. C. Peters* for Alice Sheritt.

*J. L. Coke* for the guardian ad litem.