ALBERT N. CAMPBELL, JOHN K. CLARKE AND JAMES L. COKE, TRUSTEES UNDER THE WILL AND OF THE ESTATE OF JAMES CAMPBELL, DECEASED, *v.* ABIGAIL WAHIIKAAHUULA CAMPBELL KAWANANAKOA, ET AL.

No. 2333.

ARGUED JULY 16, 1937.          DECIDED OCTOBER 22, 1937.

BANKS, J., CIRCUIT JUDGE CASE IN PLACE OF COKE, C. J., DISQUALIFIED, AND CIRCUIT JUDGE LE BARON IN PLACE OF PETERS, J., DISQUALIFIED.

334

OPINION OF THE COURT BY BANKS, J.

On the 31st day of December, 1931, the then trustees of the trust estate created by the last will and testament of James Campbell, now deceased, demised by two separate leases for a term of fifty years as and from January 1, 1929, certain sugar lands belonging to the trust estate to the Ewa Plantation Company and the Oahu Sugar Company respectively. It being doubtful whether the trust would, under the will of the testator providing for its termination, survive the leases, the trustees brought the instant bill in equity for the purpose of obtaining a judicial decree validating the leases for their full term even though the trust should terminate prior to the expiration of this term. The equity judge entered a decree in accordance with the prayer of the bill. From this decree an appeal was taken to this court by the minor respondents through their guardian *ad litem*. The other respondents being satisfied with the decree appeared in support of it.

It is conceded by the trustees that the will of the testator did not empower them of their own volition to execute leases that would be binding beyond the termination of the trust. In other words, that the only means by which this end could be accomplished would be by competent judicial action.

This concession was obviously the result of the decision of this court in *Campbell* v. *Kawananakoa*, 31 Haw. 500. That case was brought to this court on appeal and involved

the consideration of the very will of James Campbell that is now before us. One of the questions presented by the appeal (and the only one that need be considered) was as follows: "Can the trustees under the will and of the estate of James Campbell, deceased, now make a legal and valid lease for the term of fifty (50) years from January 1st, 1929, subject to existing leases and the rights of the lessees or sublessees thereunder, expiring respectively December 31st, 1939, November 30th, 1939, and December 31st, 1939, of the property mentioned in said proposal for a lease, and not subject to termination by reason of the termination of the trust within said fifty (50) year term?" The question was answered in the negative and the reason given for this conclusion was expressed in the following language: "The testator has expressly declared in his will that he wishes *all* the authority of his trustees, and all their dominion over the property, to cease at the time that he has chosen for the termination of the trust."

It may be observed that at the time the judgment of the court was sought in the earlier *Kawananakoa* case the leases had not been executed but were in contemplation and that the inquiry related solely to the authority of the trustees to execute these contemplated leases. Subsequent to the decision in that case the leases now before us were executed and the instant question is not whether the trustees had the authority to execute them but whether the court of equity is vested with the power to validate them for their full term of fifty years, notwithstanding the prior termination of the trust.

In support of the affirmative of this question our attention is called to section 4712, R. L. 1935, which is as follows: "Any circuit judge sitting at chambers in equity and having jurisdiction over a trust, on petition of one or more of the trustees, and after such notice to those interested as shall be ordered by the judge, may, if it appears to be for the

benefit of the trust estate, authorize or direct the trustee or trustees to lease or extend the terms of leases of the real property for such periods as may be deemed advantageous to the estate; or to invest moneys of the trust estate in the purchase of real or personal property, or the constructing, improving or repairing of buildings or other improvements on the land belonging to the trust estate, or in such other manner as the judge shall deem to be most for the benefit of the trust estate and as best effecting the objects of the trust. Any lease or extension of lease made under such authority or direction shall continue in force for the full period so authorized notwithstanding the trust shall have terminated."

The power conferred by the statute upon the court, in so far as it relates to the leases before us, is to authorize the trustees, if it appears to the court to be advantageous to or for the benefit of the trust estate, to validate them for their full term, notwithstanding the prior termination of the trust.

The accruing advantage or benefit, in order to justify the extension, must of necessity be an advantage or benefit to all classes of beneficiaries who under the will of the testator are to be the recipients of his bounty. If only the members of one class are to be benefited and the members of another class deprived of valuable rights devised to them by the trust instrument the authorization given by the court below to the trustees to extend the leases should not be upheld.

We think, in considering whether the validation of the leases before us for a period beyond the termination of the trust would be advantageous to all the beneficiaries, the views of the trustor as they are reflected in his will are of great consequence and should not be lightly disregarded. The material welfare of all of his children and grandchildren was a matter of deep concern to him and no doubt

after much thought he conceived a plan under which he must have been convinced their interests would be protected and best subserved. He evidently believed that it would be for the benefit of all the beneficiaries of the trust to divide his estate into two classes, income and corpus, the former to go absolutely to the life tenants during the duration of the trust and the latter to go absolutely to the remaindermen upon the termination of the trust.

The intention of the testator regarding the disposal of both the income and the corpus is fully commented on in the *Kawananakoa* case, *supra,* at page 510. After discussing the rule limiting the terms of leases granted by trustees to the duration of the trust the court said: "There is in the case at bar the further strong consideration that the testator has expressly said that 'the authority of my said trustees hereunder shall continue during the natural life and lives of my said wife, and of my children by my said wife, who shall be *in esse* at the date of my decease, and the survivor of them; and, if there shall be *in esse,* at the death of such survivor, any lawful issue of any such child as last aforesaid, then these trusts, and the authority of said trustees hereunder, shall further continue for the definite term of twenty years after the decease of such survivor, provided any such lawful issue as aforesaid shall live so long, and if not, then for such lesser term and period as he, she or they shall live.' This is an unambiguous statement of the testator's intention and desire that the authority of his trustees shall cease at the time specified by him. Their authority will cease at the death of the survivor of the testator's four children who are now still living if there shall then be *in esse* no lawful issue of any such child; or twenty years after the death of the last survivor of the four children provided lawful issue of any of the four children shall so long live and if not then until the death of the last survivor of the lawful issue of any of the four children. In the light particularly of this

provision the trustees could not grant a lease after the termination of the trust. So, also, it would be contrary to the intention of the testator for them to execute prior to the termination of the trust a lease to extend beyond the period of the trust."

Certainly the plan devised by the testator regarding the trust estate should not be discarded unless that devised by the parties to the leases provides a definite and certain benefit to both classes of beneficiaries. In order to determine this question it is necessary to examine the latter plan. For the purpose of this opinion it will suffice to quote from the Ewa Plantation lease: "It is agreed that in order to adjust the rights and obligations of the parties in the event that the trust should terminate prior to fifty (50) years from January 1, 1929, beginning with the period commencing January 1, 1940, and ending January 31, 1958, there shall be deducted from the said gross amount due or payable as rent from the Lessee to the Lessors an amount equal to one-half of one per cent. of the gross proceeds on which rent is computed for each year, and deposited with some bank or banks, trust company or trust companies, selected by the Lessors and Lessee. * * * The sum so deposited, together with all accumulations and earnings thereon, shall be deemed to be held in trust for the purpose hereinafter mentioned. Should any one of the four daughters of James Campbell, now *In Esse* be living at twelve o'clock midnight on December 31, 1958, Mid-Pacific Standard time at Honolulu, so that the full term of this lease shall not extend beyond the duration of the trust referred to hereinabove, then all of said sums so deposited in trust, together with all accumulations and earnings thereon, shall, as of that date, forthwith become the property of and be paid and delivered over to the Lessors, to be by them distributed as provided in and by the Will of said James Campbell, but the Lessee shall be under no obligation or responsibility to see

the application or distribution of said sum to the beneficiaries under said Will; but should all of the four said daughters be deceased prior to January 1, 1959, as determined by Mid-Pacific Standard time as aforesaid, then said sums so deposited in trust, together with all accumulations and earnings thereon, shall, upon the death of the last survivor of the said four daughters, forthwith become the property of and be paid and delivered over to the Lessee, and a like deduction of one-half of one per cent of the gross proceeds shall continue to be made and shall be retained by the Lessee during the remainder of the term of this lease; the maximum rental thus payable in any one year being ten and one-half per cent. (10½%) of the gross proceeds, but not in excess of fifty per cent. (50%) of the net profits as hereinbefore set forth, Subject, However, to the requirements herein contained as to the payment of the minimum rent. * * * If within five (5) years from January 1, 1932, the Lessors shall, pursuant to a decision of the Supreme Court of Hawaii, or of the United States Circuit Court of Appeals for the Ninth Circuit on Appeal, final and binding on all parties and classes in interest, make this lease certain and valid for the full term of fifty (50) years from January 1, 1929, even though the term thereof extends beyond the period of the trust under the Will of James Campbell then the above provision as to the deduction of the said one-half of one per cent. of the gross proceeds shall be inoperative, and the full rent without said deduction shall be paid."

The benefit to the life takers by the extension of these leases is apparent if the lessees operate their business at such a profit as to require the application of the percentage rental clause contained in the above quotation. Under such circumstances the authorized extension of the leases would make certain to the life takers a yearly income of 10½% and 9½% respectively of the gross proceeds of the Ewa Plantation Company and the Oahu Sugar Company, Lim-

ited. Without the extension one-half of one percent of these gross proceeds would be held in escrow until midnight of December 31, 1958, to be distributed to the income takers if any of the daughters of James Campbell are then alive, otherwise to revert to the lessees. In other words, the extension would render the escrow agreement unnecessary and inoperative for the reason that the life takers would then be assured of all the income available under the provisions of the leases without the possibility of any of it reverting to the lessees.

Let us consider what benefits, if any, will accrue to the other class of beneficiaries, namely, the remaindermen. The only possible advantage to them is that urged by the appellees. They contend that the leases provide the largest income derivable from the trust estate and that for this reason the remaindermen would be benefited by their extension beyond the duration of the trust. This contention is based on the assumption that the remaindermen will gladly accept the leases because of the assurance they give of a minimum rental and because of the possibility of having their revenues greatly increased under the percentage rental clause. The emotions of the remaindermen upon discovering that the leases had by judicial action been made binding for a period beyond the trust would depend on conditions existing when the trust terminates. If the productive value of the corpus had then so depreciated that the remaindermen could hope for nothing beyond the fixed minimum rentals no doubt they would be greatly rejoiced. On the other hand if the corpus had increased in value to such an extent that the remaindermen, if free to act without restraint, could obtain much larger returns than those provided in the leases their reaction would naturally be quite the opposite. It clearly is of no definite and certain benefit to them to be compelled to surrender the unrestricted right given by the trust instrument to deal with

the trust *res* according to their own wishes and to accept in lieu thereof the judicial discretion of the chancellor, which discretion is necessarily exercised without any foreknowledge of what the value of the corpus will be at the time the remaindermen become entitled to its full and free possession and control.

Let it be supposed that upon the termination of the trust the remaindermen are assured by conditions then existing that it will be of great benefit to them to take over the immediate management and control of the property and operate it either personally or as a corporation and thereby obtain for themselves the entire profits of the enterprise instead of being confined to such portions thereof as they might be entitled to under the leases. It is obvious under these circumstances that if the remaindermen are deprived of the right conferred upon them by the trust instrument to deal with the trust *res* according to their own wishes such denial instead of redounding to their benefit would operate to their detriment. Again let it be supposed that other persons or corporations seeking capital investment would be willing, if the terms of the trust instrument were adhered to, to enter into leases under which larger rentals would be paid than those provided in the existing leases. Under these circumstances a departure from the will of the testator regarding the ultimate ownership and control of the trust *res* would result in a disadvantage to the remaindermen. It would be inequitable and unjust to the remaindermen to deny to them the right to choose for themselves, when the time for the exercise of that right arrives, what disposition they wish to make of the corpus of the trust.

There is another reason why we think the decree of the circuit judge should not be affirmed. It has been so often judicially declared that the will of the testator is the law of the case that it has become a legal maxim. It is true that cases have arisen and may again arise in which courts of

equity dealing with trusts have found it necessary in the exercise of their inherent powers to deviate from the strict letter of the trust instrument in order to effectuate the cardinal purpose of the trustor. A familiar example of such cases is where the trust *res* has, subsequent to the death of the trustor, so greatly depreciated in value as to be incapable of producing sufficient income to meet the requirements of those who, under the trust instrument (and for whose benefit it was intended), are entitled to receive it. In such a case equity has the inherent power to order a sale of the property and direct a more profitable investment of the proceeds despite the fact that the sale is forbidden by the will of the trustor. There is nothing in the instant case that requires the application of this rule. The validation of the leases beyond the duration of the trust is neither necessary to the preservation of the trust *res* nor to the protection or conservation of the rights of beneficiaries of the trust as they are vested by the provisions of the trust instrument.

The rule regarding the force and effect of a testamentary declaration which on its face is clear and unambiguous is thus stated in *Smith* v. *Bell,* 6 Pet. (U. S.) 68: "The first and great rule in the exposition of wills, to which all other rules must bend, is, that the intention of the testator, expressed in his will, shall prevail, provided it be consistent with the rules of law. 1 Doug. 322; 1 W. Bl. 672. This principle is generally asserted in the construction of every testamentary disposition. It is emphatically the will of the person who makes it, and is defined to be 'the legal declaration of a man's intentions, which he wills to be performed after his death.' 2 Bl. Com. 499. These intentions are to be collected from his words, and ought to be carried into effect, if they be consistent with law." This principle has also been announced in this jurisdiction. (See *Harris* v. *Judd,* 3 Haw. 421; *Thurston* v. *Allen,* 8 Haw. 392; *Ninia* v. *Wilder,*

12 Haw. 104; *Rooke* v. *Queen's Hospital,* 12 Haw. 375; *Fitchie* v. *Brown,* 18 Haw. 52; *Mercer* v. *Kirkpatrick,* 22 Haw. 644; *Lucas* v. *Scott,* 239 Fed. 450; *McCandless* v. *Castle,* 25 Haw. 32; *Wodehouse* v. *Robinson,* 27 Haw. 462; *Estate of Deering,* 29 Haw. 854; *Kinney* v. *Robinson,* 30 Haw. 246; *O'Neil* v. *Dreier,* 61 F. [2d] 598; *Estate of Mary E. Foster,* 33 Haw. 666; *Estate of Campbell,* 33 Haw. 799.)

If the statute which is invoked in the instant case (§ 4712, *supra*), had been the law when the will was executed or even if it had been the law when the testator died it might very well be argued that his will was made subject to the power of the court to authorize a deviation from its provisions if it appeared to the chancellor that such deviation was for the benefit of the trust estate; in other words, that the statute became a part of the will. But neither this statute nor any similar statute was in force at the time the testator died or at the time he executed his will.

Moreover, no such statute was in force when the first grandchild of the testator was born. According to the record before us this event occurred on March 14, 1903, and the statute relied on by the appellees (§ 4712, *supra*), was not passed until the year 1933 (L. 1933, Act 194), which was approximately thirty years subsequent to the birth of this grandchild. Upon the birth of this grandchild there came into existence one of a class of beneficiaries clothed with a future interest vested by the terms of the will of the testator in the corpus of the estate. Upon the subsequent birth of other grandchildren the class opened and they also automatically became members of it. To be sure under the terms of the testator's will the right to the enjoyment of the absolute ownership and control of the corpus is postponed until the termination of the trust. The right itself, however, ceased to be nebulous and merely theoretical and became a reality. Whether it is a vested or contingent remainder it is unnecessary to decide. It is also unnecessary

to decide whether it can in advance of the termination of the trust be lawfully disposed of by those upon whom it was conferred. We think, however, that the exercise of this right, whatever its legal attributes, was immune from the interference that was sought to be imposed upon it under the provisions of section 4712, *supra*.

To state it another way, it is beyond legislative power to enact a statute subsequent to the death of the testator and subsequent to the birth of remaindermen the effect of which would be to jeopardize rights that are vested under the solemn will of the testator.

The appellees contend that the authorized continuance of the leases beyond the life of the trust will not deprive the remaindermen of any of these rights. They argue that the passing of the title of the trust *res* to the remaindermen upon the termination of the trust will not be delayed by the extension of the leases nor will their right to deal with the corpus by sale or otherwise be suspended. Conceding this to be true the fact nevertheless remains that the ownership of the trust *res* and the right of the remaindermen to deal with it according to their own wishes when they become entitled to it would not be an unqualified right as the trustor intended it should be but a right qualified by and subject to the provisions of the leases.

*Rowlett* v. *Moore,* 252 Ill. 436, was an action to probate a will. Testator died on the 3d day of May, 1906. On March 21, 1910, probate of the will was refused on the ground that one of the two witnesses to the will was the wife of the executor named in the will and that by former adjudication of the court it had been established that a will attested by the wife of the executor was not well executed where there was only one other witness thereto. The state legislature in May of 1911 passed an Act which had the effect of making the wife of an executor a competent witness. The Act further stated: " 'This act being remedial in character shall

be construed liberally and shall apply to cases arising on wills of persons deceased, prior to the adoption of this act, but not finally adjudicated.' (Laws of 1911, p. 538.)" The proponents of the will contended that the Act was applicable to wills made and executed prior to the passage of the Act. The court, speaking through Mr. Justice Vickers, tersely and effectively disposed of this contention with the following statement of the law: "The contention cannot be sustained. Upon the death of a testator property rights become fixed. If he leaves a valid will the title of the legatees and devisees becomes a vested right, and if the will is invalid his property passes, under the statute, to his heirs by descent and their title becomes vested. The legislature cannot, therefore, affect the validity of wills executed by testators who have died before the statute takes effect. A will that is invalid when the testator dies cannot be made valid by a statute passed subsequent thereto. (*Remington* v. *Bank,* 76 Md. 546; 25 Atl. Rep. 666; Page on Wills, sec. 22.) The moment the testator or intestate dies the rights of the devisees or heirs attach, for the title is then already vested, and no change in the law thereafter made can disturb such vested rights. (*Sturgis* v. *Ewing,* 18 Ill. 176.) The same doctrine is held in many other cases. (*Noakes* v. *Martin,* 15 Ill. 118; *McDaniel* v. *Correll,* 19 id. 226; *Deininger* v. *McConnell,* 41 id. 227.) To construe the act in question so as to give it a retroactive effect would, in effect, be to recognize the power of the legislature to deprive persons of property rights without due process of law, which the constitution forbids." (See also *Coleman* v. *O'Leary's Executor,* 114 Ky. 388; *People* v. *Powers,* 147 N. Y. 104; *Jones* v. *Robinson,* 17 Ohio St. 171; *Shinkle* v. *Crock,* 17 Pa. 159; *McCarty* v. *Hoffman,* 23 Pa. 507; 1 Page on Wills [2d ed.] § 25.)

We think the will of the testator in the proceeding before us is the law of the case. It possesses the authority and

finality of a constitutional provision. It is as much beyond the reach of legislative and judicial action as it was held in the *Kawananakoa* case, *supra,* to be beyond the reach of the trustees of the Campbell estate. In *Upham* v. *Plankinton,* 152 Wis. 275, which was also an attempt under a statute enacted subsequent to the death of the testator to obtain judicial authorization to extend a lease beyond the period of the trust, the court, speaking through Mr. Justice Marshall, made the following cogent observations: "Some principles which have been plainly and safely, it is thought, intrenched as a part of our unwritten law, may well be stated at the outset in writing this opinion. No discussion of them is deemed to be necessary. They have passed through that stage and become fixed in place as part of our system of unwritten rules which may be, confidently, turned to, under the guardianship of the fundamental law, to protect the inherent right of the living, reaching beyond the termination of visible existence of the inheritor, to conserve the rights, whether vested or contingent, of those *in esse* and those existing only in possibility, as well. The suggested statement of principles is not necessary because of any controversy between counsel for the respective parties as to their existence, or between counsel and the court, but because of the convenience it will afford in testing the questions to be solved and the dignity it may lend to this important case in pointing the way to right results in future similar controversies. Every person of mature years and sound mind has a right to make his own will, conformable to statutory regulations designed to safeguard that right and not violating any written or any unwritten law, and to have that will carried out according to his intent. * * * It is competent for the courts, and it is their duty, whenever invoked in the matter, to enforce the validly expressed intent of a testator and to discover such intent where there is obscurity. Neither courts nor beneficiaries nor legislatures are competent to

violate such intent and substitute their discretion for that of the testator. * * * If a person creates a valid trust in property by will or otherwise, and, expressly, or by necessary implication, provides that his creation shall not be changed by beneficiaries, trustees, or otherwise, it must be carried out according to the purpose of the creator. * * * In respect to the dignity of a trust created by will, the supreme test is, What did the testator intend? That being discovered it is the law of that trust. Courts have no power to frustrate it and substitute a different scheme,—there can be no substitute method. * * * 'The rights of an owner of property to control its use and management during his life and after his death, within certain limitations imposed by law, are among the most sacred, and entitled to the most careful protection at the hands of courts, without scrutiny as to the quality of his reasons in making such choice. Among these rights is that of preserving specific real estate as such within a limited time after his death. He may think that thereby is assured either a more certain or a larger income than could be obtained by its sale and the investment of the proceeds, or he may believe that the increase in sale value during that term will be for the best interest of those for whom he desires to provide.' His will so long as he violates no law, is supreme." (See also Will of Caswell, 197 Wis. 327; *Dunn* v. *Sargent,* 101 Mass. 336; Aetna *Life Ins. Co.* v. *Hoppin,* 214 Fed. 928; *Webster* v. *Cooper,* 14 How. [U. S.] 488.)

It is our conclusion that the right of the remaindermen to the complete ownership of and dominion over the corpus of the estate, upon the termination of the trust, having, by the death of the testator and the birth of members of the designated class of remaindermen, ripened into a vested right, it was beyond the power of the legislature in the instant case to authorize the equity court to place a burden or restriction upon the exercise of this right.

For reasons appearing in the foregoing ·opinion the decree appealed from is reversed except as to that part which relates to payment of costs and the fees of respective counsel and compensation of the guardian *ad litem.* No objection was made in the court below or in this court to this portion of the decree and it is therefore affirmed.

A decree in conformity with the foregoing opinion will be signed on presentation.

*M. K. Ashford* and *W. H. Heen,* Guardian ad litem in person (also on the briefs), for the minors.

*A. G. M. Robertson* (Robertson, Castle & Anthony on the briefs) for petitioners.·

*J. P. Russell* (F. E. Thompson with him on the briefs) for certain respondents.