RICHARD D. WELSH *v.* ALICE KAMOKILA CAMP-
BELL, AND JAMES L. COKE, ALAN S. DAVIS
AND FREDERICK OHRT, TRUSTEES UNDER
THE WILL AND OF THE ESTATE OF JAMES
CAMPBELL, DECEASED.

NO. 2991.

ARGUED MARCH 30, 1955.　　　　　DECIDED JUNE 23, 1955.

TOWSE, C. J., STAINBACK AND RICE, JJ.

OPINION OF THE COURT BY STAINBACK, J.

Plaintiff filed an action in assumpsit against the
defendant, joining the trustees of the Estate of James
Campbell as garnishees. The trustees filed their disclosure
and moved for an order discharging them by reason of the
spendthrift trust provisions of the will of James Campbell.
The defendant filed no answer and an order of default was
entered against her. On plaintiff's motion the circuit

court reserved to this court for determination the question raised by the motion of the trustees to discharge them by reason of the spendthrift trust.

There is no dispute that James Campbell intended to place the income from his trust estate beyond the reach of creditors of the beneficiaries. The sole question is whether this provision is contrary to law or public policy.

A trust may be defined as the right, enforceable solely in equity, to the beneficial enjoyment of property the legal title to which is vested in another.

A spendthrift trust is defined as one created to provide a fund for a beneficiary and at the same time secure it against his improvidence or incapacity. It is an active trust with provisions against alienation of the fund or property by the voluntary act of the beneficiary or through legal process by creditors.

The modern trust had its counterpart in a device in the early days of the Roman Empire where the legal rule was that a testator could not direct the devolution of his property beyond the first taker who was held to receive an absolute fee in the subject matter of the gift. If a testator desired that a second person should receive a benefit from his property he was obliged to place his confidence or trust in the good faith of the primary beneficiary who, however, could not be held legally accountable though the third person might have a moral claim upon him. The Emperor Augustus directed that the consuls use their power to enforce these moral rights, "and these powers later devolved upon a special officer known as fidei commisarius." (*In re Coutts' Will*, 249 N. Y. Supp. 788; 4 Kent Comm. 290; Perry, *Trusts*, 6th ed., § 2.)

This device under the doctrine of "uses" was apparently first introduced into England by the clergy for the purpose of evading the statutes of *mortmain*. However, there were so many abuses of the system of uses that finally

the Statute of Uses (27 Henry VIII c) was enacted to make the owner of the use the owner at law as well as in equity. As is well known, this statute did not accomplish what was intended and courts of equity enforced a use upon a use under the name of a trust so that a trust was a use not executed by the statute, or what a use had been before the statute.

As the early restraints on alienability, particularly of lands, were gradually being removed, the system of restraints on alienation grew up under trusts and statute.

In the earliest days of feudal times no transfer of lands could be made without the license of the overlord. (1 Pollock and Maitland, *History of English Law,* 310-330.) Then by estates tail (arising after the Statute of De Donis 1285) lands were limited to the descendents in such a way that the family would be perpetuated and no individual could dispose of the entailed lands. However, the reaction to this situation found expression in the courts in *Taltarum's Case,* Y. B. 12 Ed. IV 19, whereby a tenant in tail could bar the interests of his descendents.

To counteract this the landowners developed a new device known as the strict settlement, but this was defeated when the courts invented the rule of perpetuities which rendered it impossible for one to make his property inalienable beyond the time of life or lives in being and 21 years thereafter.

Again, as the early English rule of common law that land could not be subjected to execution by creditors in satisfaction of their claims was abolished, in lieu thereof there grew up (particularly in America) homestead exemptions, insurance, tools of one's trade and other statutory exemptions from execution by creditors.

In more modern times the doctrine of married women's equitable estates and discretionary and spendthrift trusts acted as restrictions over alienation but the various

statutes enlarging the rights of married women have rendered unnecessary the creation of women's equitable estates. Finally, the legislatures in some States have enacted statutes providing for the legality of spendthrift trusts and in some cases limiting the amount of income that may be received free from the claim of creditors and certain types of claims such as alimony, torts, etc.

Thus the struggle between attempted restraints upon alienation for the preservation of family fortunes and the doctrine that he who has the beneficial rights of property should have the responsibilities and liabilities of the owners thereof continues. By a strange quirk the decisions in England, home of the aristocrats and landed gentry, have departed more and more from the doctrine of protecting the family fortune while America, home of democracy and rugged individualism, has gone further and further toward the preservation of family fortunes.

While the great weight of authority in America upholds the validity of spendthrift trusts, there are some States where the contrary is held.

"Although there is some dissent from this view, the validity of spendthrift trusts, at least those protective of the income of trust estates against the creditors or grantees of the beneficiary, is upheld by the great weight of authority in this country * * *. The tendency has been away from the minority view denying the validity of such trusts and toward the adoption, either by statute or judicial decision, of the view upholding their validity. * * *" (54 Am. Jur., *Trusts*, § 152, pp. 126, 127.)  (See also 1 *Restatement, Trusts*, § 152; Griswold, *Spendthrift Trusts*, § 58; 1 Scott, *Trusts*, § 152.)

The reasoning of those upholding and those declaring spendthrift trusts invalid range all the way from the Pennsylvania cases — one of which makes the sweeping assertion that "Whoever has the right to give, has the right

to dispose of the same as he pleases. *Cujus est dare ejus est disponere,* is the maxim which governs in such case." (*Ashhurst* v. *Given,* 5 W. & S. 323, 330); and another which states "It is always to be remembered that consideration for the beneficiary does not even in the remotest way enter into the policy of the law; it has regard solely to the rights of the donor." (*Morgan's Estate,* 223 Pa. 228, 230, 72 Atl. 498, 499) — to the statement of Fairman in "Mr. Justice Miller and the Supreme Court," (pp. 321-323) that a spendthrift trust is a "contrivance for the protection of wastrels."

Griswold, in his book *Spendthrift Trusts,* has reviewed most exhaustively the decisions and status of spendthrift trusts in all jurisdictions. While he has criticised very severely what he calls the confusion and ignorance that gave rise to the growth of such trusts in the last eighty years, in the second edition he repeats the statement in the preface of the first edition that "A large proportion of all trusts today are spendthrift trusts." He recognizes that since *Nichols* v. *Eaton,* 91 U. S. 716, 23 L. Ed. 254, decided in 1875, there has been a trend in most jurisdictions in the United States favorable to the validity of spendthrift trusts, which trend has been the result partly of judicial decision and partly of statutes.

In his book on spendthrift trusts Griswold points out that the doctrine holding spendthrift trusts valid was first announced in *Nichols* v. *Eaton,* 91 U. S. 716, 23 L. Ed. 254, decided in 1875. Griswold sets forth that the "dictum" in *Nichols* v. *Eaton* arose because of a confusion arising from the lack of equity courts, and any lack of equity powers in the law courts, in Pennsylvania in the early part of the nineteenth century. He also attributes the growth of spendthrift trusts to the influence of statements made by Perry, *Trusts.*

As showing the growth of spendthrift trusts subse-

quent to the case of *Nichols* v. *Eaton, supra,* Griswold quotes from Perry's work on *Trusts* from the first edition (1872) as follows: "Trusts cannot be created with a proviso, that the equitable estate, or interest of the *cestui que trust,* shall not be alienated or charged with his debts." The second edition (1874) states: "If an absolute equitable interest is given to a *cestui que trust,* no restraints upon alienation can be imposed. But a trust may be so created that no interest vests in the *cestui que trust;* consequently, such interest cannot be alienated, as where property is given to trustees to be applied in their discretion to the use of a third person, no interest goes to the third person until the trustees have exercised this discretion." The third edition (1882) six years after the decision in *Nichols* v. *Eaton, supra,* states "there is eminent authority in the Federal and State courts for the proposition, that the power of alienation is not a necessary incident to an equitable estate for life, and that the owner of property may, in the free exercise of his bounty, so dispose of it as to secure its enjoyment to the objects of his bounty without making it alienable by them or liable for their debts, and that this intention, clearly expressed by the founder of a trust, must be carried out by the courts."

The gist of the basis for the legality of spendthrift trusts is thus stated in the leading case of *Nichols* v. *Eaton*, 91 U. S. 716, 725, which has been cited and quoted in practically all the spendthrift trust decisions since it was rendered:

"But, while we have thus attempted to show that Mrs. Eaton's will is valid in all parts upon the extremest doctrine of the English Chancery Court, we do not wish to have it understood that we accept the limitations which that court has placed upon the power of testamentary disposition of property by its owner. We do not see, as implied in the remark of Lord Eldon, that the power of

alienation is a *necessary* incident to a life-estate in real property, or that the rents and profits of real property and the interest and dividends of personal property may not be enjoyed by an individual without liability for his debts being attached as a necessary incident to such enjoyment. This doctrine is one which the English Chancery Court has ingrafted upon the common law for the benefit of creditors, and is comparatively of modern origin. We concede that there are limitations which public policy or general statutes impose upon all dispositions of property, such as those designed to prevent perpetuities and accumulations of real estate in corporations and ecclesiastical bodies. We also admit that there is a just and sound policy peculiarly appropriate to the jurisdiction of courts of equity to protect creditors against frauds upon their rights, whether they be actual or constructive frauds. But the doctrine, that the owner of property, in the free exercise of his will in disposing of it, cannot so dispose of it, but that the object of his bounty, who parts with nothing in return, must hold it subject to the debts due his creditors, though that may soon deprive him of all the benefits sought to be conferred by the testator's affection or generosity, is one which we are not prepared to announce as the doctrine of this court.

"If the doctrine is to be sustained at all, it must rest exclusively on the rights of creditors. Whatever may be the extent of those rights in England, the policy of the States of the Union, as expressed both by their statutes and the decisions of their courts, has not been carried so far in that direction.

"It is believed that every State in the Union has passed statutes by which a part of the property of the debtor is exempt from seizure on execution or other process of the courts; * * * This has come to be considered in this country

as a wise, as it certainly may be called a settled, policy in all the States. * * *

"Nor do we see any reason, in the recognized nature and tenure of property and its transfer by will, why a testator who *gives,* who gives without any pecuniary return, who gets nothing of property value from the donee, may not attach to that gift the incident of continued use, of uninterrupted benefit of the gift, during the life of the donee. Why a parent, or one who loves another, and wishes to use his own property in securing the object of his affection, as far as property can do it, from the ills of life, the vicissitudes of fortune, and even his own improvidence, or incapacity for self-protection, should not be permitted to do so, is not readily perceived.

"These views are well supported by adjudged cases in the State courts of the highest character."

*Spindle* v. *Shreve,* 111 U. S. 542, 547, states as follows: "It cannot be doubted, that it is competent for testators and grantors, by will or deed, to construct and establish trusts, both of real and personal property, and of the rents, issues, profits and produce of the same, by appropriate limitations and powers to trustees, which shall secure the application of such bounty to the personal and family uses during the life of the beneficiary, so that it shall not be subject to alienation, either by voluntary act on his part, or *in invitum,* by his creditors. The limits, within which such provisions may be made and administered, of course, must be found in the law of that jurisdiction which is the *situs* of the property, in case of real estate, and in cases of personalty, where the trust was created or is to be administered according to circumstances."

In *Shelton* v. *King,* 229 U. S. 90, portions of the syllabus read:

"While one may not by his own act preserve to himself the enjoyment of his own property in such manner that it

shall not be subject to claims of creditors or to his own power of alienation, a testator may bestow his own property in that manner upon one to whom he wishes to secure beneficial enjoyment without being subject to the claims of assignees or creditors. *Claflin* v. *Claflin,* 149 Massachusetts, 19, approved.

"The courts of this country have rejected the English doctrine that liability to creditors and freedom of alienation are necessary incidents to enjoying the rents and profits from the property by the object of bounty of a testator."

In this case (*Shelton* v. *King, supra*) the statement of Mr. Justice Miller in the leading case of *Nichols* v. *Eaton* is quoted with approval, also a number of cases sustaining the same view such as *Hyde* v. *Woods,* 94 U. S. 523; *Broadway National Bank* v. *Adams,* 133 Mass. 170; *Mason* v. *Rhode Island Hospital Trust Co.,* 78 Conn. 81; *Jourolman* v. *Massengill,* 86 Tenn. 81; *Henson* v. *Wright,* 88 Tenn. 501; *Brooks* v. *Raynolds,* 59 Fed. Rep. 923; *Smith* v. *Towers,* 69 Md. 77; *Keyser* v. *Mitchell,* 67 Pa. St. 473; *Seymour* v. *McAvoy,* 121 Cal. 438; *Steib* v. *Whitehead,* 111 Ill. 247; *Wallace* v. *Campbell & Maxey,* 53 Tex. 229; *Garland* v. *Garland,* 87 Va. 758; *Lampert* v. *Haydel,* 96 Mo. 439.

In presenting the arguments for and against spendthrift trusts Bogert, *Trusts and Trustees,* 1A, section 222, pages 470, 471, states as follows:

"The position of the spendthrift trust in the United States is *fairly well fixed.* Therefore *it may seem somewhat academic to discuss the reasons* urged for and against such trusts when their validity was being determined in the nineteenth century. However, such a presentation has some practical aspects, since in a few states there are no decisions on the subject and since Legislatures may well

liberalize or restrict the doctrines of the spendthrift trust in the coming years. (Emphasis added.)

"Probably the strongest argument for the spendthrift trust is that of freedom of disposition on the part of the donor. Many courts have felt that a property owner ought to be able to give on such conditions and limitations as he chooses, provided no principle of public policy be violated. And they have not felt that there was anything anti-social in the spendthrift trust."

Next, Bogert quotes from the Pennsylvania case of *In re Morgan's Estate, supra,* which bases its decision on the theory that a donor should be allowed to condition his bounty to suit himself so long as he violates no law in so doing; that when a spendthrift trust has been created the law holds the *donor* has an individual right of the property in the execution of the trust and to deprive him of it would be a fraud on his generosity.

Bogert then presents the argument of the antagonists of the spendthrift trusts as to its unjust effects upon the creditors of the *cestui,* the injurious consequences to the beneficiaries themselves, and to the repugnant character of the restrictive clause.

Bogert also discusses the desirability of statutory regulations, quoting the model statute on spendthrift trusts which has been prepared by Griswold and will be discussed hereinafter.

Although there may be no decisions squarely upon the point, all the Hawaiian decisions indicate that a spendthrift trust is valid.

In the case of *Harris* v. *Judd,* 3 Haw. 421, 430, the majority of the court took the view that an assignment of income from a trust was valid and right to the income was complete and absolute and no words were used to restrain its alienation. In other words, there was no intent to create a spendthrift trust; but in the dissenting opinion

of Allen, C. J., taking the view that it *was* the intent of the testator to create a spendthrift trust for his son, occurs the following statement:

"By the language used in the will, when the income is to be paid over for use and support, a discretionary power is vested in the trustee. It is not a payment only, but a payment for the use and support of the beneficiary. * * *

"When the father gave to the trustee authority to apply the income to the use and support of his son, was it not for the very purpose of preventing the possibility of his squandering it? Had it been a life estate, without limitation, over which the beneficiary had the entire control, no such language would have been used. * * *

"This interest in his father's estate was a matter of public record, and every one inclined to give credit to the son, could decide for himself his interest in the estate, or wait till the Court had given a construction to the will. There can be no fraud where there is no concealment, and if any one has given credit to the son, he had the means, by which he could judge, whether it was safe to give credit, or not. To save improvident persons from squandering their interest in property, is often a reason for a trust like this. But no creditor can properly complain who had the means of knowing the precise pecuniary situation of the son, as in this case, so far at least, as it was affected by the will of the father. * * *"

Likewise, *Harrison* v. *Davis*, 22 Haw. 465, affirmed 240 Fed. 97, while not actually deciding that a spendthrift trust in Hawaii was valid, held so in substance as the court stated that the object of the trust was to provide and secure for the defendant a home and an opportunity to make a living out of the land as he might elect to take, and that such right to occupy and use the land was personal to Davis. The following quotation from the decision is pertinent: "The clear weight of authority in the

United States is to the effect that a trust may be created under which the beneficiary may be entitled to receive an income which he cannot anticipate by assignment and which is free from the claims of creditors, and it is held that the right of alienation is not a necessary incident to an equitable interest to income or support for the life of the beneficiary. It is also held that the right of alienation of such an interest does not exist where it would be destructive of the trust and incompatible with its purposes though there be no express prohibition. [Then follow citations.] We hold that under the deed of trust here involved the right of Davis to occupy and use the land for certain purposes was personal to Davis and did not extend to his assigns. This was the intention of the donor as we gather it from the deed. The object was to provide and secure for the defendant either a home and an opportunity to make a living out of the land, or an income, as he might elect to take. A right to assign the right of occupancy would be incompatible with that object and we must give effect to the apparent intention of the donor in this respect even though the right to assign the income was not restricted."

Also, the case of *Crescent City Motors* v. *Nalaielua,* 31 Haw. 418, 426, held "That property may be transferred by will or by deed upon such terms as to keep it beyond the reach of creditors of the donee may for the purposes of this opinion be assumed to be true." However, the court held that under the language of the trust instrument there was no indication of an intent to place or maintain the property beyond the reach of creditors.

Attention is called by plaintiff to section 1, Revised Laws of Hawaii 1945, which states "The common law of England, as ascertained by English and American decisions, is declared to be the common law of the Territory of Hawaii * * *" and he argues that spendthrift trusts

were not and are not recognized by the English common law and, therefore, should not be recognized in Hawaii.

For that matter, equitable interests could not be attached under the English common law as *"This doctrine is one which the English Chancery Court has ingrafted upon the common law for the benefit of creditors, and is comparatively of modern origin."* (*Nichols* v. *Eaton,* 91 U. S. 716, 725.) (Emphasis added.)

Though the present proceeding is an equitable one, the case of *Dole* v. *Gear,* 14 Haw. 554, held that equity is included in the common law within the meaning of this statute (R. L. H. 1945, § 1) and further pointed out that the common law consists of fundamental principles and reasons and is a system of legal logic rather than a fixed and inflexible set of rules. This case has been quoted with approval in a number of Hawaiian cases, the latest of which is *Territory* v. *Alford,* 39 Haw. 460.

In *Dole* v. *Gear,* as well as in *Territory* v. *Alford, supra,* the following quotation from *Morgan* v. *King,* 30 Barb. 9, appears: "* * * 'when it is said that we have in this country adopted the common law of England, it is not meant that we have adopted any mere formal rules, or any written code, or the mere verbiage in which the common law is expressed. It is aptly termed the *unwritten law* of England; and we have adopted it as a constantly improving *science,* rather than as an *art; as* a system of *legal logic,* rather than as a *code* of *rules.* In short, in adopting the common law, we have adopted its fundamental principles and modes of reasoning, and the substance of its rules as illustrated by the reasons on which they are based, rather than by the mere words in which they are expressed.' " (*Dole* v. *Gear, supra,* pp. 561, 562.)

In *Territory* v. *Alford, supra,* the court held that a wife might testify against her husband where she was the

victim of the husband in a white slave case even though at common law and the Hawaiian statute embodying the common law that provides one spouse cannot testify for or against another in a criminal prosecution except in case of an offense of *physical* violence committed by one against the person of the other. The court held that it was not restricted by the actual decisions at common law, stating that the common law interpreted in the light of modern experience, reason and the furtherance of justice, this prohibition does not apply; it permits a wife to testify against her husband in a prosecution for a crime committed by the husband which corrupts the wife's morality; that this is an offense "against the person of his wife"; that the same reasons apply to the one as to the other.

Again, as stated in the case of *Macaulay* v. *Schurmann*, 22 Haw. 140, 144, "And, as pointed out in *Dole* v. *Gear*, 14 Haw. 554, 561, the common law consists of principles and not of set rules and admits of different applications under different conditions * * *."

Some other cases dealing with the nature of common law are:

*The People* v. *Randolph*, 2 Parker's Cr. R. 174, 176, which states: "The common law consists of those principles and maxims, usages and rules of action which observation and experience of the nature of man, the constitution of society and the affairs of life have commended to enlightened reason, as best calculated for the government and security of persons and property. Its principles are developed by *judicial decisions* as necessities arise from time to time demanding the application of those principles to particular cases in the administration of justice." (Emphasis added.)

"The common law is but the crystallized conclusions of the judges arrived at from applying the principles of

natural right and justice to facts actually experienced in cases before them." (*Scott* v. *Kirtley,* 113 Fla. 637, 152 So. 721, 722 fn.)

"*The common law does not consist of absolute, fixed, and inflexible rules, but rather of broad and comprehensive principles based on justice, reason, and common sense. It is of judicial origin and promulgation. Its principles have been determined by the social needs of the community and have changed with changes in such needs.* These principles are susceptible of adaptation to new conditions, interests, relations, and usages as the progress of society may require." (*Miller* v. *Monsen,* 228 Minn. 400, 37 N. W. [2d] 543, 547.)

That the common law is not arrived at by simply following the English decisions is shown in *Sayward* v. *Carlson,* 1 Wash. St. 29, 40, where in construing a statute similar to the Hawaii statute it was stated: "But we do not subscribe to the next proposition, that resort can be had only to the decisions of English courts, or to those of American courts which have followed them * * *. * * * *since courts have had an existence in America they have never hesitated to take upon themselves the responsibility of saying what is the common law, notwithstanding current English decisions,* especially upon questions involving new conditions. Therefore, we have the 'common law' as declared by the highest courts of this, that and the other state, and by the courts of the United States, sometimes varying in each. And we understand, by § 1 of the code, that *where there are no governing principles of the written laws, the courts of the late territory, and of this state, are, in all matters coming before them, to endeavor to administer justice according to the promptings of reason and common sense, which are the cardinal principles of the common law; but not that the decisions of the English*

*courts are to be taken blindly and without inquiry as to their reasoning or application to the circumstances."* (Emphasis added.)

Where there are no governing provisions of the written law, the courts in all matters coming before them endeavor to administer justice "according to the promptings of reason and common sense." The common law is declared by the highest courts of each State and varies in the several States, and the courts of Hawaii can continue to declare, as they have in the past, the common law of Hawaii based upon justice and sound reason and not inconsistent with settled authorities.

It is interesting to note that not only is the common law of judicial origin and promulgation but also admiralty law. "Since there is no controlling statute the question must be decided as a part of the judicially created admiralty law." (*William A. Bisso, Jr., Receiver, New Orleans Coal and Bisso Towboat Co.* v. *Inland Waterways Corporation,* No. 50, October Term 1954, Supreme Court of the United States, decided May 16, 1955.)

As stated before, the overwhelming weight of authority in America is that spendthrift trusts are valid. The Hawaiian courts have intimated that the American rule is sound and at present it is practically regarded as a rule of property in Hawaii, especially by draftsmen of trust instruments. At this late date it would not seem desirable to upset the validity of such trusts.

Finally, the plaintiff argues that if the present spendthrift trust is not invalid *in toto,* it should at least be limited as to the amount of income which the spendthrift beneficiaries would receive.

Undoubtedly there are certain unsatisfactory results that may flow from unrestricted spendthrift trusts. One of them is where a person with a very large income refuses to pay ordinary debts. However, the limitation of any

amount of income which the beneficiary of a spendthrift trust should receive free from execution by creditors is, we deem it, a question for the legislature and not for the judiciary.

Bogert, *Trusts,* in his argument for and against the desirability of spendthrift trusts points out that a model statute has been drafted by Griswold which has been adopted in Louisiana and Oklahoma. The statutes do not exempt income from a spendthrift trust where the claim is for the support of a husband, wife or child of the beneficiary, or for alimony or for tort, or necessary services rendered or supplies furnished to the beneficiary, or income due or to accrue in the future to the beneficiary in excess of $5,000 per annum.

In a number of States even without statute the right of a wife to reach the interests of a beneficiary of a spendthrift trust has been upheld to satisfy a judgment for alimony though the authorities are divided upon this point. (Griswold, *Spendthrift Trusts,* §§ 338, 339, pp. 395-398; *Hollinrake* v. *Hollinrake,* 40 Haw. 397, 406, 407.) As stated, trusts are the creature of equity and should be administered in a way which is consistent with true equity. "Equity will not feed the husband and starve the wife. Neither will it favor the wife to the detriment of the husband." (*Wetmore* v. *Wetmore,* 149 N. Y. 520, 529.)

Likewise, the beneficiary's interest may be reached for the payment of taxes and similar claims. There are a number of decisions to this effect. (Griswold, *Spendthrift Trusts,* § 345, p. 407, citing cases.)

Undoubtedly a limitation upon the amount of income that might be received by a cestui, as well as the claims of creditors for necessary services rendered or supplies furnished to the cestui, or claims for torts committed by such cestui are proper subjects for legislation.

There is much to be said for the invalidity of a spend-

thrift trust, as well as to the contrary. On the one hand a donor cannot give a legal estate to a donee so as to deprive creditors of the rights of execution against the same, so it may well be asked why permit him to do with an equitable interest what he could not do with a legal interest. On the other hand a donor can support an insolvent donee in luxury and no one can complain because a creditor of the donee has no legal claim against the donor, so why not permit a donor to do through another (trustee) what he could do directly himself with his own property. This would permit a settlor to provide for the donee (widow, son, daughter or other object of the settlor's solicitude) after the settlor has passed away.

Considering the overwhelming weight of authority in the United States, the balancing of conveniences, the long-continued assumption by the Hawaiian courts and draftsmen of trust instruments in the Territory of the validity of spendthrift trusts, and the Hawaiian courts being free to choose, we believe this court should follow the United States Supreme Court's decision in *Nichols* v. *Eaton*, *supra*, wherein, as repeated *supra*, it is stated:

"Nor do we see any reason, in the recognized nature and tenure of property and its transfer by will, why a testator who *gives*, who gives without any pecuniary return, who gets nothing of property value from the donee, may not attach to that gift the incident of continued use, of uninterrupted benefit of the gift, during the life of the donee. Why a parent, or one who loves another, and wishes to use his own property in securing the object of his affection, as far as property can do it, from the ills of life, the vicissitudes of fortune, and even his own improvidence, or incapacity for self-protection, should not be permitted to do so, is not readily perceived.

"These views are well supported by adjudged cases in the State courts of the highest character."

The intent of the testator being clear to create a spend-thrift trust, we hold that the spendthrift provision is not contrary to law or public policy in Hawaii and the garnishees should be discharged.

*F. D. Padgett* (*Robertson, Castle & Anthony* with him on the briefs), for garnishees-appellants.

*R. D. Welsh* (*B. Kanbara* with him on the brief), for plaintiff-appellee.