## IN THE MATTER OF THE ESTATE OF JAMES CAMPBELL, DECEASED.

### No. 4056.

ARGUED APRIL 17, 1958.　　　　　DECIDED JUNE 20, 1958.

RICE, C. J., MARUMOTO, J., AND CIRCUIT JUDGE TASHIRO IN PLACE OF STAINBACK, J., DISQUALIFIED.

OPINION OF THE COURT BY MARUMOTO, J.

This case comes before us on an appeal by the guardian ad litem appointed in connection with the accounts filed by John Kirkwood Clarke and James Leslie Coke, as trustees under the will and of the estate of James Campbell, deceased, covering the period January 1, 1951, through September 25, 1951. Hereafter the guardian ad litem will be referred to as the guardian, John Kirkwood Clarke and James Leslie Coke as the petitioning trustees and the accounts filed by the petitioning trustees as the 1951 accounts; and the word "trustees," used without qualification, will have reference to the incumbent trustees of the Campbell Estate from the beginning of the trust and is not limited to the petitioning trustees.

The appeal poses the following questions:

1. Do the trustees have the authority to sell any of the lands constituting the original corpus of the estate?

2. Do the trustees have the authority to sell top soil, rock or sand in place on any lands constituting the original corpus of the estate?

3. If the answer to each of the above questions is that the trustees have the authority but that the authority may be exercised only in certain contingencies, does the determination of the existence of the contingency rest with the trustees or with the court?

4. If the answer to the preceding question is that the determination rests with the trustees, are there situations where the court may review the determination of the trustees?

5. If the answer to the last question is that there are situations where the court may review the trustees' determination, upon such review, do the trustees have the burden of justifying their determination, or is the burden upon the person questioning the trustees' action to show that there is no justification for the determination?

The guardian was originally appointed to represent only the minor beneficiaries of the trust living at the time of the filing of the 1951 accounts. Later, the scope of his representation was enlarged to include all other persons not in being at the time of his appointment "who upon being born shall become similarly situated and acquire an interest in the estate."

The accounts were referred to a master, who filed a report recommending their approval. After the filing of the master's report, the guardian filed his answer to the petitioning trustees' petition for the approval of the accounts and his exceptions to the report.

In answering the petition, the guardian treated it as a petition for the approval not only of the 1951 accounts but of all prior accounts of the trustees from the beginning of the trust. He alleged:

(1) That the schedule in the 1951 accounts, entitled "Receipts of Principal," shows sales of topsoil, rock and sand, which were not authorized by the will of James Campbell;

(2) That the accounts of the petitioning trustees and their predecessors, from the beginning of the trust until December 31, 1950, show the sales or exchanges of lands, being portions of the original corpus of the estate, to persons other than governments or other entities holding

the power of eminent domain, some of which sales or exchanges were unauthorized by the will; and

(3) That the accounts of the petitioning trustees and their predecessors show the sales of topsoil, rock and sand, being portions of the original corpus of the estate, commencing October 30, 1908, and continuing to September 24, 1951, which sales were unauthorized by the will.

The guardian excepted to the master's report because it involved the approval of the sale of topsoil, rock and sand and the disbursements connected with such sales.

Thus, the guardian's answer and exceptions raised the issue as to the legality of the trustees' sales of lands, topsoil, rock and sand. The circuit judge adjudicated the issues in "Judgment Determining Claims," in which he held that such sales were authorized by the will and overruled the guardian's exceptions to the extent that they were predicated on the illegality of such sales. This appeal is from that adjudication.

Sales of oil and minerals in place are held to be sales of interests in the lands on which the oil and minerals are found. (*Ohio Oil Co.* v. *Daughtee*, 240 Ill. 361, 88 N. E. 818; *In re McFadden's Estate*, 224 Pa. 443, 73 A. 927) By parity of reasoning, sales of topsoil, rock and sand constitute sales of interests in the lands from which such materials are taken. Consequently, the question as to the authority to sell topsoil, rock and sand will be settled by our answer to the question regarding the authority to sell lands.

The trustees derive their authority, whatever it may be, from the will of James Campbell. The will has previously been considered in the following cases: *Campbell Estate* v. *Campbell-Parker*, 18 Haw. 34; *Campbell Estate* v. *Campbell-Parker*, 18 Haw. 342; *Hawaiian Trust Co.* v. *Von Holt*, 216 U. S. 367; *Campbell* v. *Kawananakoa*, 31 Haw. 500; *Estate of Campbell*, 33 Haw. 799; *Campbell* v.

*Kawananakoa,* 34 Haw. 333; *Estate of James Campbell,* 36 Haw. 631; *Estate of James Campbell,* 40 Haw. 543; and *Welsh* v. *Campbell,* 41 Haw. 106. The authority of the trustees to sell the lands of the estate was not a material issue in any of these cases. Any statement in the cases regarding such authority is dictum. Thus, we shall consider the question as to such authority as one of first impression, unhampered by any former decision.

The will does not contain any specific grant of authority to the trustees to sell trust property, real or personal, with the possible exception of securities. The direction to the trustees in the eighth article to "realize upon * * * securities" may be construed as a specific authority to sell the securities. Otherwise, if there is any authority to sell under the will, it must exist by implication. We think that a grant of authority to the trustees to sell lands may be implied from the provisions of the eighth, twelfth and twenty-second articles of the will. The articles read as follows:

"EIGHTH: With respect to all property which shall be so distributed to them, other than that mentioned in the last preceding paragraph, I direct my Trustees aforesaid, to reduce it to possession, and to hold, manage, control, preserve and direct it; and to pay all costs and charges thereof, including their own commissions for such administration. And to collect all the rents, issues, profits, income and revenue thereof, and collect and realize upon all credits and securities, at such times, and in such manner, and upon such terms as to them shall seem best,—and to invest and reinvest, and keep invested,—and at will to change the investments of any and all moneys that shall come to their hands by virtue hereof, and which are not otherwise herein specifically bequeathed, assigned or appropriated; and to segregate, and keep separate and

apart, (during the life of my wife), the accounts of and pertaining to the realty of my Estate from the accounts pertaining to any and all other thereof."

"TWELFTH: It being my purpose herein to provide a safe and certain income and maintenance for my wife, our children and grandchildren, for and during the period of the trusts hereby established, I do will and direct that each female beneficiary hereunder shall receive and hold all moneys and other rights and privileges herein provided for free from the debts and control of any husband she may have after the date of the execution of this Will, — and that the Trustees herein named, and their successors in trust hereunder, shall keep intact my Estate, and administer the same under the name of "The Estate of James Campbell,"—and that the realty thereof, (except as herein provided in the case of said residence premises) shall be particularly and especially preserved intact, and shall be aliened only in the event, and to the extent, that the obvious interests of my Estate shall so demand."

"TWENTY SECOND: I will and direct that no person who shall in good faith pay money to my Executrix, Executors or Trustees hereunder, in discharge or on account of any valid obligation to my Estate, nor any purchaser from said Executrix, Executors or Trustees, of any real or personal property of my Estate, in manner authorized by this Will, shall be in anywise responsible for the application or misapplication by said Executrix, Executors or Trustees of the money so paid, or of the proceeds of the purchase or sale of such property."

There are a number of cases which hold that a grant of authority in a will to hold, manage and control trust property includes authority to sell such property. (2 Scott

on Trusts, § 190.1; 1 Restatement of the Law of Trusts, § 190; 54 Am. Jur., *Trusts*, § 442; 90 C. J. S., *Trusts*, § 288; Annotation, "Implied Power of Executor or Testamentary Trustee to Sell Real Property," 134 A. L. R. 378, supp'd 23 A. L. R. [2d] 1000) An examination of such cases shows that the conclusion is reached not solely on the basis of the use of such words as hold, manage, control, and the like, but upon a consideration of the meaning attributable to such words in the light of other provisions of the will. A testamentary provision is construed in the context of the entire will, as an integral part of the whole and not as a disjointed fragment.

The eighth article of the will directs the trustees to hold, manage, control, preserve and direct all trust property. The provision, standing alone, may be insufficient to authorize any sale. But it may reasonably be construed to include an authority to sell, if there are other provisions in the will which are meaningless in the absence of such authority.

We think that the direction to the trustees in the twelfth article that the realty of the estate "shall be aliened only in the event, and to the extent, that the obvious interests of my Estate shall so demand" is meaningless unless there is somewhere in the will a grant of authority to sell lands. That direction is neither a grant nor a prohibition. It is merely a limitation on an authority which is assumed to be elsewhere given. In imposing the limitation, the testator clearly assumed that he had given the authority to sell lands. To say otherwise is to say that the testator did an absurd act of limiting an authority that he did not grant. A cardinal principle in the construction of a will is that "If two constructions are each fairly possible, one of which indicates an absurd or unjust intention, and the other indicates a reasonable and fair intention, the courts will give preference to that construction which indicates

a reasonable and fair intention." (2 Page on Wills, 3rd ed., § 924)

There is also an assumption by the testator of a grant of authority to sell lands in the provision of the twenty-second article that any purchaser from the trustees of "any real or personal property of my Estate, in manner authorized by this Will," shall not be responsible for the application or misapplication by them of the proceeds of the sale of such property. He refers to sales of real property as well as personal property. The expression, "in manner authorized by this Will," as applied to a sale of land, clearly has reference to the limitation contained in the twelfth article.

The eighth article also contains a direction to the trustees to invest and reinvest, and keep invested, "all moneys that shall come to their hands by virtue hereof." In some cases, a grant of authority to sell is implied from a direction to invest and reinvest. Here the direction appears in the same sentence in which the trustees are directed to collect all rents, issues, profits, income and revenue from the trust property and to realize upon all credits and securities. That does not mean that it applies only to moneys derived from rents and other items of income and realizations upon credits and securities. The direction is to invest and reinvest all moneys that come into the hands of the trustees "by virtue hereof," that is, by virtue of the will. If the trustees have authority to sell trust property, the proceeds of any sale are moneys that come into their hands by virtue of the will and are subject to the direction to invest and reinvest. But in directing the trustees to invest and reinvest, the testator did not necessarily have to assume that there would be proceeds of sales of trust property, for the direction is also operative on moneys that come into the hands of the trustees otherwise than from such sales. So, in this case, we do

not think that the direction to invest and reinvest has any bearing in the determination of the question as to whether the trustees have authority to sell.

It appears from the provisions of the twelfth and twenty-second articles that there was not a doubt in the testator's mind that he had given an authority to the trustees to sell lands. In the absence of other specific provision in the will to that effect, we conclude that the testator considered that the authority was sufficiently embraced in the direction in the eighth article to hold, manage, control, preserve and direct the trust property.

The guardian does not take the position that the trustees are absolutely prohibited from selling the lands of the estate. He says that, under the limitation in the twelfth article of the will that the lands shall be aliened only in the event, and to the extent, that the obvious interests of the estate shall so demand, the trustees are required to justify every sale of land, topsoil, rock or sand, when the propriety of such sale is questioned. He also stated, in answer to the question asked at the argument on this appeal, that, if a sale is made with the approval of the court in a proceeding in which all of the interested parties, including persons not in being but who upon being born acquire interests in the estate, are represented, then such sale is unassailable. In other words, the guardian's position is that the ultimate determination of the question as to whether the obvious interests of the estate demand a sale of any land of the estate rests with the court and not with the trustees, and that, if the trustees make any sale without the prior approval of the court and the sale is questioned, the burden is upon them to justify their action.

In support of his position, the guardian relies upon the statements of this court in *Campbell* v. *Kawananakoa,* 31 Haw. 500, 509; *Campbell* v. *Kawananakoa,* 34 Haw. 333, 337; and *Estate of James Campbell,* 36 Haw. 631, 643;

and the statement of the dissenting justice in *Estate of James Campbell,* 40 Haw. 543, 570.

We said at the outset that such statements are dicta. However, even if they are not dicta, they do not affect our holding, for they merely reiterate a fact that is undisputed. That fact is that the testator directed the trustees to keep his estate intact, particularly and especially the realty thereof, but that such direction was not absolute in that he gave a limited authority to the trustees to sell the lands in the event, and to the extent, that the obvious interests of the estate so demanded. The statements do not throw any light on the question as to whether it is the responsibility of the trustees or the court to determine the existence of a contingency which justifies the trustees in exercising their authority to sell, where they are directed to exercise the authority only in a limited contingency, and on the question of the burden of proof as between the trustees and the person questioning their action, where an issue as to the propriety of the trustees' action in selling the lands of the estate is raised.

The question as to whether the trustees or the court should determine the existence of a contingency justifying the trustees in exercising their authority to sell was squarely presented in *Hyde* v. *Smith,* 11 Haw. 535. That case involved the seventeenth paragraph of the first codicil to the will of Bernice Pauahi Bishop, the pertinent portion of which is as follows:

> "17th I give unto the trustees named in my will the most ample power to sell and dispose of any lands or other portion of my estate, and to exchange lands and otherwise dispose of the same; and to purchase land, and to take leases of land whenever they think it expedient, and generally to make such investments as they consider best; but I direct that my said trustees shall not purchase land for said schools if any

596

lands come into their possession under my will which in their opinion may be suitable for such purpose; and I further direct that my said trustees shall not sell any real estate, cattle ranches, or other property, but to continue and manage the same, unless in their opinion a sale may be necessary for the establishment or maintenance of said schools, or for the best interest of my estate."

The question posed was whether, under that testamentary provision, the trustees were required to obtain the approval of the court before exercising their authority to sell. The circuit judge held that such approval was not required in a decision in which he concluded: "I therefore find that by the will of Bernice Pauahi Bishop, the trustees acting thereunder are vested with a discretion to act in regard to the sale and disposal of land, devised or conveyed to them whenever it appears to them expedient and for the best interest of the estate; that they are under no obligation to apply to a court of equity for permission so to do; and that a court of equity should not intervene unless it is made to appear that the trustees are abusing the discretionary powers vested in them." This court sustained the decision of the circuit judge.

The guardian argues that *Hyde* v. *Smith* is not apposite. He points to the fact that in that case the testatrix gave to the trustees "the most ample power to sell" and authorized them to sell the lands if "in their opinion" a sale is necessary for the establishment and maintenance of the Kamehameha Schools or for the best interest of the estate, while in this case there is no language specifically granting such broad authority and discretion to the trustees. We do not think that such fact is material.

The phrase, "the most ample power to sell," in the will of Bernice Pauahi Bishop, is misleading. She obviously did not mean that she gave the most ample power to sell

under any and all circumstances, because she did not. She gave to the trustees an authority to sell, to be exercised only in situations specified in her will. So, what the testatrix meant by that phrase must be that she gave to the trustees the power to do all things necessary and proper to carry out their limited authority. If so, strictly as a matter of semantics, the phrase is superfluous. Even without such phrase, the trustees have such incidental power. (2 Scott on Trusts, 2d ed., § 186; 2 Restatement of the Law of Trusts, § 186) In 2 Restatement of the Law of Trusts, § 186, Comment *d*, it is stated: "In addition to the powers conferred in specific words by the terms of the trust, the trustee has such powers as are necessary or appropriate to carry out the purposes of the trust and are not forbidden either in specific words or otherwise by the terms of the trust. It is to be inferred that the settlor intended to confer upon the trustee such powers as under the circumstances known to or anticipated by the settlor are necessary or appropriate to carry out the purposes of the trust."

Nor does the presence or absence of the phrase, "in their opinion," add to or detract from any discretionary authority that the testator gave to the trustees. In the twelfth article of the will, the testator spoke to the trustees. His direction that the realty of the estate "shall be aliened only in the event, and to the extent, that the obvious interests of my Estate shall so demand," calls for an exercise of discretion on the part of some person. Obviously, the testator conferred the power to exercise the discretion upon the trustees, for the direction in the article is only to the trustees.

The case of *State* v. *Strong,* 185 S. C. 27, 192 S. E. 671, is closely parallel to the instant case. It involved the will of one John K. Crosswell, who devised and bequeathed his property to three trustees. He directed the trustees to

build and maintain an orphanage when his estate should reach such proportions as would warrant it. The principal asset of the estate consisted of one-half of the capital stock of a corporation which held a valuable franchise from Coca-Cola Bottling Company. With regard to the stock, the testator provided: "I do not desire my trustees to sell the stock unless it should be manifestly to the interest of my estate to part with it, and in the event that a point is reached where it shall be to the manifest benefit of my estate to sell the stock, then I direct that it shall be first offered to those representing the other half of the stock * * *."

The similarity between that provision and the provision in the twelfth article is notable. There the testator first stated: "I do not wish my trustees to sell the stock * * *." Here the testator stated: "I do will and direct * * * that the realty thereof * * * shall be particularly and specially preserved intact * * *." In each case, the testator, immediately after making such statement, left an opening to the trustees, the opening there being "unless it should be manifestly to the interest of my estate to part with it, and in the event that a point is reached where it shall be to the manifest benefit of my estate to sell the stock," and the opening here being "only in the event, and to the extent, that the obvious interests of my Estate shall so demand."

The trustees, in that case, sold the stock to the owner of the other half of the stock. In doing so, they purported to act under the authority conferred upon them by the will. Six years after the sale, the state of South Carolina, on behalf of the orphanage, instituted a suit to set aside the sale as being in violation of the will. The matter was referred to a master, who filed an exhaustive report in which he found that the sale was valid. The state took exceptions to the report. The trial court sustained the

exceptions, but the supreme court reversed and held that the sale did no violence to the will. In so holding, the supreme court adopted the master's report in its entirety. The master, after finding that the trustees had the authority to sell the stock, stated:

"As a corollary to the above conclusions, I find that the desire expressed in the will that the stock be retained can not be construed as an absolute mandate not to sell. The words: 'I do not desire my trustees to sell the stock unless it shall be manifestly to the benefit of my estate to part with it' are followed immediately by the words, 'in the event that a point is reached,' etc., indicated beyond any question that the stock could be sold. The testator recognized that he was no prophet—that no man knows what the future holds. He did not specify the conditions precedent to such a sale. I can not see any possibility of construing the words as mandatory.

"It is true that the word 'manifest' is a very strong word. The testator leaves no doubt that he wished this stock to be held. He knew its value. He realized that Coca-Cola is a commodity ever growing in popularity. He could think of nothing better into which the money could be put. In the Master's opinion, he was right. But, he did leave an opening for a sale, 'when a point is reached where it shall be to the manifest benefit of my estate to sell the stock.'"

The master then held, on the authority of *Jennings* v. *Teague,* 14 S. C. 229, that it was within the power of the trustees to determine when a sale was to the manifest benefit of the estate, and concluded: "The gift of the power to his trustees by Mr. Crosswell is as effectual and binding on the court as the gift of the corpus to the orphanage. The will speaks only to the donees of the power;

there is not even a suggestion that they should take their problems to anyone else."

*Jennings* v. *Teague, supra,* involved the validity of a sale of land by the executor of the will of one P. L. Calhoun of South Carolina. The testator made his will in 1861 in which he provided: "I desire that my executors * * * shall sell all my estate, both real and personal, * * * so soon as the value of property shall recover from the depression caused by the existing war." He died sometime in 1863. The executor qualified in the same year, and, immediately upon his qualification, sold a tract of land belonging to the estate for Confederate money. Five years later, the adult children of the testator and the guardian ad litem of his minor children filed a bill in equity in which they challenged the validity of the sale on the ground of want of authority in the executor to make the sale. They prayed for a decree holding the executor to strict accountability for his alleged violation of the terms of the will, declaring the sale null and void, and requiring the purchaser to account for the rents and profits of the land from the date of the sale. There was a conflict of opinion as to whether, at the time of the sale, the value of the property had recovered from the depression caused by the war. At the time of the sale, Confederate money was the only money in circulation. The executor sold for such money in accordance with the following opinion of three disinterested appraisers: "In view of all the circumstances, the situation of the country, the condition of the currency, and for the good of all parties, that the executor should sell the estate for cash in Confederate money." The chancellor held that the sale was valid and that neither the executor nor the purchaser could be held liable on account of such sale. There was an appeal from the decision of the chancellor on two grounds, the second ground being that the power to sell was conditional, and as the condi-

tion never happened the power never vested. The supreme court affirmed the decision of the chancellor, and, in so doing, stated:

"As to the second ground, it is quite clear that the power of sale was a conditional one, and it is equally clear that the condition was, in its nature, precedent and not subsequent, and that, such being the case, until the condition was performed, or the contingency, upon which the power was conferred, happened, the power could not be lawfully exercised. So that the real question in this case is, whether the contingency upon which the power to sell was given had happened at the time the sale was made, and as subsidiary to this, who was to determine whether the contingency had happened. To solve these questions it will be necessary to inquire what was the nature of the condition. Was it the happening of a distinct and independent fact, or was it a condition, which, in its very nature, involved the exercise of judgment or discretion for the determination of whether it had happened, and about which, therefore, there might well be, as there was in this very case, honest difference of opinion. It certainly was not a distinct and independent fact, as if the testator had provided that the executor should sell when a certain person should attain to a certain age, but it was a condition, the happening of which could only be determined by an exercise of judgment. When the value of property should recover from a depression caused by a war, or by any other special circumstance, must necessarily be a question to be determined by the exercise of judgment—one about which persons might and probably would honestly differ. What was to be the extent of the recovery which would authorize a sale? Somebody must judge of this, and if the executor is not permitted to do so, then it is

difficult to suggest who could. If the executor commits an error of judgment in determining such a question, that, certainly, ought not to invalidate a sale made by him in the honest exercise of his judgment. If it did, then it would be impossible to tell, until after it was tested by a judicial proceeding, whether any sale made under such a power was valid, and if such a rule be established it would destroy all chances of making such a sale, for, certainly, no one would buy with the prospect of having his title inquired into and assailed years after upon the ground that the executor had committed an error of judgment in determining a question which was left to his discretion.

"It is perfectly manifest that the testator in this case intended to invest his executor with power to sell in a certain contingency, the happening of which must necessarily be determined by an exercise of judgment, and unless his executor — the person whom he has selected as possessing more of his confidence than any one else—is authorized to determine this question, then the purpose of conferring upon the executor the power to sell would be practically defeated. That purpose, doubtless, was to avoid the necessity of obtaining an order of the court for the sale, which would involve delay and expense; but if the executor is denied the power of determining the time for the sale, or if his honest determination is liable to be revised and reversed by the court, then, clearly, it would have been better to have required a resort to the court in the first instance, rather than to give an apparent power to the executor which would only serve to delude purchasers and result in greater delay and larger expense than if the will had required a resort to the court in the first instance. * * *

"When, therefore, as in this case, a power of sale

is given to an executor, upon the happening of a contingency which can only be ascertained by the exercise of judgment and discretion, and the executor, in the honest exercise of his judgment, determines that such contingency has happened and accordingly makes the sale, such sale cannot be invalidated, even though it should be made to appear, in the light of subsequent events, that the executor had committed an error of judgment in determining whether the contingency had happened upon which he was authorized to sell. If, however, it should appear that the executor erred wilfully, or from such gross negligence as would imply wilfullness, then it would be different, and the question whether the sale should be allowed to stand, would depend largely upon whether the purchaser had notice of such misconduct upon the part of the executor. In this case, as we have seen, there is no foundation for a suspicion even that the executor acted otherwise than honestly in determining whether the contingency had happened upon which he was authorized to sell, and, therefore, upon the principles above stated there is no ground for invalidating the sale."

We have quoted from the opinion at length because we think that the reasoning in it is sound, and, if we were to set forth our view, we would merely be repeating what is so well stated there.

The holdings in *Hyde* v. *Smith, State* v. *Strong,* and *Jennings* v. *Teague* are in accord with the law as stated by Professor Scott in his treatise on "The Law of Trusts" and in the Restatement of the Law of Trusts. (2 Scott on Trusts, 2d ed., § 187; 1 Restatement of the Law of Trusts, § 187) Professor Scott states: "To the extent to which the trustee has discretion, the court will not control his exercise of it as long as he does not exceed the limits of the discretion conferred upon him. The court will not sub-

stitute its own judgment for his. Even where the trustee has discretion, however, the court will not permit him to abuse the discretion. This ordinarily means that so long as he acts not only in good faith and from proper motives, but also within the bounds of a reasonable judgment, the court will not interfere; but the court will interfere when he acts outside the bounds of a reasonable judgment." The statement in the Restatement of the Law of Trusts is that "Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." Comment *e* to the mentioned section of the Restatement further states: "If discretion is conferred upon the trustee in the exercise of a power, the court will not interfere unless the trustee in exercising or failing to exercise the power acts dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of a reasonable judgment. The mere fact that if the discretion had been conferred upon the court, the court would have exercised the power differently, is not a sufficient reason for interfering with the exercise of the power by the trustee."

We, therefore, hold that where, as here, the trustees have the authority to sell the lands of the estate but the testator has directed the trustees to exercise such authority in certain contingencies which he specified, the determination of the existence of the contingency which justifies the exercise of the authority rests with the trustees, and the determination of the trustees may not be reviewed by the court except to prevent the trustees from abusing their discretion.

That answers the third and fourth questions. We shall now consider the last question, which relates to the burden of proof when the propriety of the trustees' exercise of

their authority to sell is questioned. General language supporting either side of the question may be found.

In the case of *In Re Minch's Will,* (Ohio App.) 71 N. E. (2d) 144, it is stated: "Every sale of trust property by a trustee when brought into question must be supported by the trustee. The burden is upon him to show that it was made under the authority conferred upon him by the trust and that it was made in utmost good faith for the best price obtainable and without benefit to himself." However, the decision in the case did not turn on the burden of proof, but on "the holding that the sale of trust property by a trustee to his wife constitutes constructive fraud and is voidable without proof of actual fraud on the theory of self-dealing * * *." The case involved sales of trust property by a trustee to his wife and to his father. Upon the same facts, the court declined to extend the doctrine against self-dealing to sales to the father. If the court applied the quoted rule as to the burden of proof in its decision, it did not apply it consistently because it reached different results, with respect to sales to the wife and sales to the father, although the proof regarding the care used by the trustee to obtain the best price obtainable was the same. On this point the court said: "There is no valid objection by the exceptors that stock sales were not for the best price obtainable. In fact the record discloses the care with which the trustee determined what the market price should be on every occasion when sales were made by calling brokers and others who, because of their knowledge and experience, were able to give sound advice upon the subject." Consequently, we consider that the statement in that case as to the burden of proof is dictum.

In *Neel* v. *Barnard,* 24 Cal. App. (2d) 406, 150 P. (2d) 177, the court recognized the general rule that, on an accounting for a trust the trustee has the burden of establishing the correctness of his accounts but limited

the application of the rule to proof of the correctness of a charge or a credit by satisfactory evidence. It stated: "It does not require the trustee to anticipate and defend against charges of dereliction of duty and malfeasance which do not arise from anything on the face of his accounts but are grounded on other matters. It does not remove from a plaintiff who sues a trustee on charges of fraud and malfeasance the burden, which the law would cast on him in case of another defendant, of proving his charges. The trustee is entitled to the benefit of the presumptions of regularity and good faith."

*Conant* v. *Lansden*, 341 Ill. App. 488, 94 N. E. (2d) 594, was a proceeding for an accounting in which the personal representative of the trustee presented a complete book of account of contemporaneous entries covering a period of more than thirty years. By stipulation, the book of account was treated as the trustee's report, and objections were filed to various entries therein. The court stated the following rule as to the burden of proof in such a situation:

"* * * If a trustee presents complete accounts, but is further required to go back over many years and show by extrinsic evidence that each purchaser from the trust paid the exact amount recorded, and every purchase made by the trust was actually delivered, was necessary to the trust, and was used by it, the resulting burden would be so onerous, no one could, as a practical matter, undertake such superhuman responsibility.

"In our opinion the true rule is this: where the trustee keeps and presents a complete account of his acts, a party objecting to any item has the burden of going forward with evidence to substantiate the objection. If competent evidence is produced which establishes the inaccuracy or illegality of any items, or

renders them doubtful and obscure, then the burden of proof is upon the trustee to establish their validity, and it becomes a question of fact whether he has sustained his claim by a preponderance of the evidence."

There appears to be a difference in the nature of the burden of proof as stated in *Neel* v. *Barnard* and in *Conant* v. *Lansden*. While it is not quite clear from the opinion, the rule in the former case appears to place the ultimate burden on the person questioning the trustee's action. The rule in the latter case definitely is that the ultimate burden of justifying the action is on the trustee, the burden upon the person questioning the trustee's action being merely to overcome the presumption of regularity and good faith of such action.

We think that a reasonable rule to be applied where the only question concerning the accounts of a trustee relates to the trustee's exercise of his discretionary authority is one which combines the holdings in *Neel* v. *Barnard* and *Conant* v. *Lansden;* that is, a rule which accords to the trustee the benefit of the presumption of regularity and good faith and imposes upon the person questioning the trustee's action the burden of overcoming the presumption, but which requires the trustee ultimately to justify his action if sufficient evidence is produced to overcome the presumption.

Our answer to the last question, then, is that where the trustees' determination as to the existence of a contingency justifying the exercise of their discretionary authority to sell lands, topsoil, rock and sand is questioned, the trustees are entitled to the benefit of the presumption of regularity and good faith, that the person questioning the trustees' action has the burden of producing evidence to overcome the presumption, and that, upon the production of such evidence, the trustees have the ultimate burden of establishing the regularity and

good faith of the questioned action by a preponderance of evidence.

In this case, the trustees start with a strong presumption of regularity and good faith. The will provides a measure of internal check on the actions of the trustees. The twentieth article reads: "The concurrence of any two of my * * * Trustees * * * shall suffice for any act herein authorized. If one * * * Trustee shall dissent from the others in regard to any considerable transaction, or respecting the general course pursued by the majority, it shall be the duty of such dissentient to state the reasons for his * * * dissent * * * in the next Annual Report of the Trustees * * *." The guardian has not called the attention of this court to any dissent in any of the accounts from the beginning of the trust. The likelihood is that, if there were irregularities and acts of bad faith, there would have been at least one trustee in the course of half a century who would have expressed his dissent as provided in the will.

With such presumption existing in favor of the trustees, the inquiry that logically follows concerns the steps, if any, that the guardian took to overcome it.

As stated earlier in this opinion, the guardian alleged in his answer that the trustees' sales of lands, topsoil, rock and sand were unauthorized by the will. For proof of his allegations he relied solely on the accounts of the trustees from the beginning of the trust, on file in "In the Matter of the Estate of James Campbell, Deceased," being Equity No. 2388 of the records of the circuit court of the first circuit. He stated at the hearing before the circuit judge: "The only evidence that I would offer I think is already before the Court — namely the accounts of the Trustees from the inception down through and to September 25, 1951, and I would like to have that stipulated to in case of any doubt that the Court can consider all

of those accounts. * * *" Counsel for the trustees so stipulated, and the guardian thereupon said, "Well, that would take care of everything, then, insofar as evidence to be adduced by the Guardian is concerned * * *."

In his answer, the guardian made only general allegations of ultimate facts, and made no attempt to allege specific facts. He later provided the circuit judge with "Specifications of Examples and Categories," in which he incorporated the particulars which he deemed sufficient for the purpose of obtaining a ruling on the legal questions raised by his allegations. In the specifications, he listed extracts from items in the trustees' accounts, from the beginning of the trust, showing sales of lands, topsoil, rock and sand. Nowhere did he allege or make any showing that the trustees abused their discretion in making the sales.

Thus, there is nothing in the record of this case to overcome the presumption of regularity and good faith in favor of the trustees. The absence of any allegation or evidence to overcome the presumption is not due to lack of diligence on the part of the guardian. He has been most conscientious. We place full credence in the following statement that he made to the circuit judge: "I would add one other item, and that is that the accounts of the Trustees, from the inception of this trust to and through September 25, 1951, have been examined by the guardian ad litem. This has been a rather long task, but it finally has been completed, and both the Answer and the Exceptions which have been filed are based upon the results of that investigation."

The guardian advances an additional argument in support of his position that the trustees are required to justify every sale of land, topsoil, rock and sand when the propriety of such sale is questioned. He says that "it is the right and duty of a court to protect the rights and in-

terests of infant parties, especially where they appear both personally and as representatives of a class of persons yet unborn." He relies on *Lalakea* v. *Laupahoehoe Sugar Co.*, 35 Haw. 262.

In the *Lalakea* case, the guardian ad litem entered into a stipulation for the entry of a consent decree in a partition suit affecting the interests of a minor and a class of unborn persons of which the minor was one, and the circuit judge entered a decree pursuant to the stipulation. It was not clear from the record whether the judge entered the decree without making any prior inquiry as to its effect upon the interests of the minor and the class of which he was one. This court reversed the decree on the ground that "where the consent decree waives or surrenders substantial rights of the minor, the decree will not be binding because it would denote a surrender of the rights of the infant without investigation by the court." Thus, the specific holding in the case is that the court may not blindly rubber stamp the action of a guardian ad litem. It does not go so far as to require the court to apply one rule as to burden of proof where adults are concerned and another rule where minors are involved.

The minor beneficiaries in this case, including the class of persons yet unborn, are entitled to assert the same rights against the trustees as the adult beneficiaries. It is the duty of the court to assure the assertion of such rights. For that purpose, it is incumbent upon the court not only to appoint a guardian ad litem but also to satisfy itself that the guardian ad litem performed his duty properly. This, the circuit judge did in the instant case. He appointed the guardian, a respected member of the bar. The guardian laboriously examined the accounts of the trustees from the beginning of the trust and called the attention of the circuit judge to items in such accounts which, in his opinion, reflected actions unauthorized by the will.

The circuit judge conducted a thorough hearing, extending over several days, on the issues raised by the guardian. Thus, the judgment appealed from is far different from the decree in the *Lalakea* case. It is the result of the most assiduous and vigorous representation of the interests of the minors by the guardian and the most painstaking consideration of the issues by the circuit judge. Nor is the judgment in this case a judgment on the pleadings. It is a judgment based on evidence adduced by the guardian, the evidence being the complete accounts of the trust on file in the circuit court. As to such evidence, the guardian stated to the circuit judge: "As a matter of fact, all the evidence I have is right in the accounts." In view of the record in this case, we are of the opinion that the circuit judge properly discharged the duty of protecting the rights and interests of the minors.

Affirmed.

*Joseph V. Hodgson,* guardian ad litem (also on the briefs) for appellants.

*Frank D. Padgett (Robertson, Castle & Anthony* with him on the brief) for appellees.

*Harold S. Wright (Smith, Wild, Beebe & Cades* with him on the brief) for Pacific Concrete & Rock Co., Ltd., amicus curiae.